JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Shamrock Bank of Illinois

**DEFENDANTS**
First American Title Ins. Co.

**(b)** County of Residence of First Listed Plaintiff   Collier County, FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Orange County, CA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Christopher W. Byron
Byron Carlson Petri & Kalb
411 St. Louis St., P.O. Box 527, Edwardsville, IL 62025

Attorneys *(If Known)*
Sandra J. Tatoian and Deanna Litzenberg
Mathis, Marifian & Richter, Ltd.
125 N. Buchanan St., P.O. Box 247, Edwardsville, IL 62025

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1  Original Proceeding
- ☒ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district *(specify)*
- ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:
breach of contract by title insurance company to insured

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $
1,400,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
01/28/2013

SIGNATURE OF ATTORNEY OF RECORD
Sandra J. Tatoian   *Sandra J Tatoian*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SHAMROCK BANK OF FLORIDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. <u>3:13-cv-00092-DRH-PMF</u> |
| | ) | |
| FIRST AMERICAN TITLE | ) | Removed from the Circuit Court of |
| INS. CO. | ) | the Third Judicial Circuit, Madison |
| | ) | County, Illinois, Case No. 12-L-2053 |
| Defendant. | ) | |
| | ) | |

## DEFENDANT FIRST AMERICAN TITLE INS. CO.'S NOTICE OF REMOVAL

COMES NOW Defendant, First American Title Ins. Co., by and through its attorneys, Mathis, Marifian & Richter, Ltd., and pursuant to 28 U.S.C. §1446 files this Notice of Removal from the Circuit Court of the Third Judicial Circuit, Madison County, Illinois to the United States District Court for the Southern District of Illinois, and in support hereof, states:

### Statement of the Case

1. On December 19, 2012, Plaintiff Shamrock Bank of Florida filed an action against Defendant First American Title Ins. Co. in the Circuit Court of the Third Judicial Circuit, Madison County, Illinois, Case No. 12-L-2053.

2. Service of process was made on Defendant on January 11, 2013. In accordance with 28 U.S.C. §1446(b), this Notice of Removal is made within thirty (30) days from service of process, and is filed within one year of the filing of Plaintiff's Complaint.

### Grounds for Removal

3. Plaintiff's cause of action is one in which this Court has original subject matter jurisdiction under the provision of 28 U.S.C. §1332, and is one which may be removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. §1441 (a), in that it is a civil action

between citizens of different states where the matter in controversy as alleged in Plaintiff's Complaint exceeds the sum or value of $75,000.00, exclusive of interest and costs.

4.   Plaintiff Shamrock Bank of Florida is a Florida corporation with its principal place of business in Naples, Florida.  Defendant First American Title Ins. Co. is a California corporation, with its principal place of business in Santa Ana, California.

5.   The citizenship of Plaintiff and Defendant existed at the time this suit was commenced and remains unchanged at the time of removal.   Complete diversity of citizenship exists as required by 28 U.S.C. §1332 (a).

6.   This case also meets the jurisdictional amount required by 28 U.C.S. §1332 (a). Plaintiff's Complaint claims damages in excess of $1,400,000.00, exclusive of interest, costs and attorney fees.

7.   Copies of all pleadings that have been filed and served are attached hereto as Exhibits A through F, and a copy of the docket sheet is attached as Exhibit G.

8.   Upon filing this Notice of Removal, written notice of the filing will be provided by Defendant to the Plaintiff through its counsel as required by 28 U.S.C. §1446(d).

9.   In accordance with 28 U.S.C. §1446(d), a copy of this Notice of Removal is also being filed with the Circuit Court of the Third Judicial Circuit, Madison County, Illinois.

WHEREFORE, Defendant First American Title Ins. Co. prays that the above styled action now pending in the Circuit Court of the Third Judicial Circuit, Madison County, Illinois be removed to this Honorable Court.

Dated: _January 28, 2013_                                  Respectfully submitted,

                                                           MATHIS, MARIFIAN & RICTHER, LTD.

                                                           By _Sandra J. Natoian_
                                                           SANDRA J. NATOIAN, #6278580
                                                           DEANNA L. LITZENBURG, #6270172
                                                           Attorneys for Defendant

Mathis, Marifian & Richter, Ltd.
125 N. Buchanan
P. O. Box 247
Edwardsville, IL 62025
Phone: (618) 656-2244
Fax: (618) 656-1307
statoian@mmrltd.com

December 20, 2012

## STATE OF ILLINOIS
### IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT
### MADISON COUNTY
155 N Main St., Edwardsville, IL 62025
(618) 296-4464
madisoncountycircuitclerkIL.com

CASE No. 2012 L 002053

DATE: December 20, 2012

SHAMROCK BANK OF FLORIDA

**PLAINTIFF**

VS.

FIRST AMERICAN TITLE INS CO
C/O MICHAEL T MILLS R/A
27775 DIEHL RD STE 200
WARRENVILLE, IL 60555

**DEFENDANT**

DEFENDANT:  FIRST AMERICAN TITLE INS CO

You are hereby summoned and required to file an answer in this case, or otherwise file your appearance, in the office of the Madison County Circuit Clerk, within 30 days after service of this summons, exclusive of the day of service.  If you fail to do so, a judgment or decree by default may be taken against you for the relief prayed in the complaint.

This summons must be returned by the officer or other person to whom it was given for service, with endorsement thereon of service and fees, if any, immediately after service.  If service cannot be made, this summons shall be returned so endorsed.

This summons may not be served later than 30 days after its date.

Witness: MARK VON NIDA the Clerk of said Circuit Court and the seal thereof, at Edwardsville, Illinois, this December 20, 2012 .



MARK VON NIDA
CLERK OF THE CIRCUIT COURT

BY: _Bentlage_
Deputy Clerk

---

(Plaintiff's attorney or plaintiff if he is not represented by an attorney)
CHRISTOPHER W. BYRON
BYRON CARLSON PETRI & KALB
411 ST LOUIS ST
PO BOX 527
EDWARDSVILLE, IL 62025

Date of Service:_____, 20_____.
(To be inserted by officer on the copy left with the defendant or other person)

*Eric S. Blohm*
*process server*
*#115-001963*

*Kellerman*
*Investigations*

*1-11-13 gs*

**EXHIBIT**

A

IN THE CIRCUIT COURT
FOR THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

**FILED**

DEC 19 2012

CLERK OF CIRCUIT COURT #9
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

SHAMROCK BANK OF FLORIDA,       )
                                )
            Plaintiff,          )
                                )
    v.                          )        Cause No. 12-L-2053
                                )
FIRST AMERICAN TITLE INS. CO.,  )
                                )
            Defendant.          )
                                )

## COMPLAINT

COMES NOW Plaintiff, Shamrock Bank of Florida ("Shamrock") by and through its

attorneys, Byron Carlson Petri & Kalb, LLC, and for its Complaint against First American Title

Ins. Co. ("First American"), states as follows:

### THE PARTIES

1.     Shamrock is a Florida corporation with its principal place of business at 895 Fifth

Avenue South, Naples, Florida.

2.     First American is a California corporation with its principle place of business in 1

First American Way, Santa Ana, California.

### JURISDICTION AND VENUE

3.     This Court has personal jurisdiction over First American pursuant to 735 ILCS

5/2-209(3) because the real property giving rise to the dispute is located in Madison County,

Illinois.

**EXHIBIT**

tabbies

B

<u>ALLEGATIONS COMMON TO ALL COUNTS</u>

**I.     The Simmons Sale the Property to Great River Subject to a Possibility of Reverter**

4.     John and Jayne Simmons ("Simmons"), as Trustees of the River House Trust dated August 21, 2003, held title in fee simple absolute to property located at 12 Danforth, Alton, Illinois.

5.     On January 22, the Simmons entered into a Real Estate Sale Agreement ("Sale Agreement") with Great River Enterprises Limited Partnership No. 1 ("Great River") for conveyance of the Property subject to a possibility of a reverter. The principal officer of Great Rivers was Mr. James L. Tomer.

6.     In exchange for the conveyance, Great River agreed to deliver to the Simmons one million shares of the common stock of YTB International, Inc. ("YTB").

7.     Paragraph 3.1 of the Sale Agreement expressly titled, "Possibility of Reverter", provided for termination of Great River's interest in the Property as of December 31, 2011 (the "Reversion Date"), unless certain conditions pertaining to YTB stock were satisfied.

8.     More specifically, the Sale Agreement provided:

Subject to the remaining provisions of this Section 3.1, the Property shall revert to [Simmons] on December 31, 2011 (the "Reversion Date") unless at any time prior to the Reversion Date, [the YTB Stock] has attained a Trading Price equal to [$6,000,000.00] (the "Benchmark Price") for a period of ninety (90) consecutive trading days....

\*\*\*

If the Property reverts to [Simmons] pursuant to the first sentence of this Section 3.1, then [Simmons] shall convey and deliver back to [the Mortgagor] one million (1,000,000) shares of [the YTB Stock]....

9.     The Sale Agreement further provided that "the Reversion Date will be accelerated automatically upon the occurrence of ... Purchaser's waste of the Property, including without

limitation, abuse, destructive use, neglect or any act or omission causing material or unreasonable injury, damage, or loss to the Property."

10.    The conveyance was documented in a Trustee's Deed dated January 24, 2007, and the Deed was recorded in the Madison County Recorder's Office on February 12, 2007.

11.    Paragraph 1 of the duly recorded Trustee's Deed expressly stated, "[t]he Property is subject to a possibility of a reverter, the specific terms and conditions of which are set forth in section 3.1 of that certain Real Estate Agreement dated January 22, 2007."

## II.    Mr. Tomer Acquires Loan to Improve the Property

12.    In late 2007 Mr. Tomer of Great River made inquiries at Meridian Bank ("Meridian") regarding the possibility of Great River taking a loan against the property.

13.    In connection with those inquiries, Meridian ran a title search through First American, and despite the Trustee's Deed being of public record, the title commitment (the "Title Commitment") resulting from that search did not reveal the Simmons' possibility of reverter. A copy of the Title Commitment is attached hereto as **Exhibit A.**

14.    First American did not locate the Trustee's Deed upon its title search conducted for Meridian.

15.    On December 6, 2007, Great River executed a mortgage on the Property in favor of Meridian to secure a $1.3 million revolving line of credit ("Mortgage").

16.    That same day – December 6, 2007 – Shamrock and Meridian entered into a Participation Certificate and Agreement related to the Great River Mortgage.

17.    When the Mortgage was granted, the lien created was subject to any and all existing encumbrances on the Property, including the possibility of reverter set forth in the Trustee's Deed.

18.    On December 11, 2007, First American issued Policy No. 1753426 in the amount of $1.3 million for Property, naming Meridian Bank, its successors and assigns, as the insured (the "Policy"). A copy of the Policy is attached hereto as **Exhibit B**.

19.    On the date the Mortgage was granted, First American had not put Meridian on notice of the possibility of a reverter in the Trustee's deed.

**III.    Meridian Bank Closes/ Great River Defaults on the Loan**

20.    On or about October 10, 2008, the Illinois Department of Financial-Professional Regulation-Division of Banking closed Meridian, and the FDIC, was named receiver.

21.    On February 13, 2009, the FDIC, in its capacity as receiver, assigned the Mortgage and loan and documents securing the same to FH Partners. A copy of the FDIC assignment is attached hereto as **Exhibit C**.

22.    On August 25, 2009, Shamrock Bank submitted a notice of claim letter to First American.

23.    In that correspondence, counsel for Shamrock wrote: "Recently Tomers and their attorney ... have contacted Shamrock to advise them of two issues: (1) due to the financial difficulties being experienced by the Tomers, the loan is likely to soon be in default; and (2) the title to the property which secures the loan is subject to a reverter clause in favor of [the Simmons'".

24.    Shortly thereafter, on September 15, 2009, Shamrock declared the Mortgage in default.

25.    On November 4, 2009, FH Partners entered into a Loan Sale Agreement and an Absolute Assignment and Assumption of Mortgage and Loan Documents with Shamrock, assigning to Shamrock all of FH Partners' rights, title, and interest in the Mortgage, and the Policy. A copy of the Loan Sale Agreement is attached hereto as **Exhibit D**.

26.    The Assignment was recorded with the Madison County Recorder of Deeds on November 30, 2009.

27.    The Assignment assigned to Shamrock, among other rights, all right title, and interest in and title insurance policy for land, buildings, structures and improvements located there on serving as security for the Loan.

**IV.    The Possibility of Reverter is Triggered**

28.    By late December 2009, Great River had committed "waste", including neglect, of the Property, by failing to (a) pay 2008 real estate taxes, resulting in a lien against the Property; (b) pay 2008 dues to the neighborhood committee, resulting in a lien against the Property; and (c) maintain the boilers on the Property, causing damage to the Property and placing the Property at serious risk of further could weather damage in December 2009.

29.    As a result of Great River's waste and neglect of the Property and Great River's refusal to pay outstanding taxes and dues and to replace the boilers, the Simmons chose to pay the back taxes and dues and to replace the boilers on the Property.

30.    Immediately thereafter, on January 7, 2010, the Simmons sent Great River's counsel a draft complaint, seeking a declaratory judgment that "waste" had occurred, triggering automatic acceleration of the Reversion Date, and that, as a consequence, the Property reverted to the Simmons.

31.    Rather than contest the threatened declaratory judgment action, Great River acknowledged its failure to pay 2008 real estate taxes and association dues, which led to liens being filed against the Property, and its failure to maintain the boilers on the Property, constituted waste and neglect, triggering automatic acceleration of the Reversion Date.

32.    The Simmons and Great River then entered into an Agreement Regarding Reversion as of January 15, 2010 ("Reversion Agreement"), in which the parties agreed that the

Reversion Date had accelerated automatically as per the Sale Agreement and the Trustee's Deed and that title to the Property reverted to the Simmons.

33. In Paragraph 4(a)(vii) of the Reversion Agreement, Great River represented and warranted to the Simmons that it would convey and deliver the Property to the Simmons "free and clear of any liens, charges or encumbrances". Moreover, Great River agreed to indemnify the Simmons "from and against all claims, demands, liabilities, causes of action, suits, judgments, damages and expenses relating to ... any liens or financial obligations in connection with that certain Mortgage dated December 6, 2007 executed by [Great River] in favor of Meridian Bank." The Simmons directed that title to the Property be conveyed to the Annuity Trust.

34. A Deed evidencing the transfer was recorded in the Madison County Recorder's office on January 22, 2010.

### V. The Madison County Litigation

35. On February 25, 2010, the Simmons brought action to quiet title in the Circuit Court of Madison County, Illinois, styled John and Jayne Simmons, et al. v. Shamrock Bank of Florida, et al. (2010-CH-245).

36. The Simmons sought an order from the court for quiet title and to ascertain and determine the ownership of the real property and the rights of the competing interests therein.

37. Shamrock demanded First American defend it pursuant of the Policy.

38. Shamrock filed its answer in June 2010 and, on July 16, 2010, filed a counterclaim to foreclose the Mortgage and for judgment against the Tomers and the Simmons.

39. On October 25, 2011, the Honorable Clarence Harrison entered judgment in favor of the Simmons and against Shamrock, effectively foreclosing any interest Shamrock had in the Property (the "Judgment").

40.     On December 1, 2011, Shamrock appealed the Judgment to the Fifth District Court of Appeals (the "Court of Appeals").

41.     On October 10, 2012, the Court of Appeals issued a Rule 23 Order affirming the Judgment.

42.     First American did not seek further appellate review of the Judgment.

43.     The Judgment is final and no appeal rights exist for Shamrock.

44.     First American's failure to locate the Possibility of Reverter and disclose it on the Title Commitment resulted in Shamrock issuing a loan that was not properly secured by the Property.

45.     Great River, James L. Tomer and Christine J. Tomer are in default of the Loan obligations and Shamrock is unable to foreclose on the Property to recover any proceeds on the Loan.

46.     Shamrock made demand on First American via its attorney to pay Shamrock under the Title Commitment and the Policy for the damages it incurred as a result of First American's failure to locate the Possibility of a Reverter in the Trustee's Deed.

47.     First American has refused to pay Shamrock.

48.     First American has refused to acknowledge Shamrock's rights that it was assigned in the Title Commitment and the Policy.

COUNT I
(Breach of Contract)

49.     Shamrock incorporates herein by reference all preceding allegations.

50.     First American issued the Policy in the name of Meridian Bank.

51.     Pursuant to the terms of the Loan Sale Agreement, Meridian, through FH Partners, assigned the Policy to Shamrock.

12-L-____
Page 7 of 63

52.    The Policy insured against any defect in or lien encumbrance in the title to the

Property. Specifically, the Policy provided, in relevant part:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM
> COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, FIRST
> AMERICAN TITLE INSURANCE COMPANY, a California corporation (the
> "Company") insures as of Date of Policy and, to the extent stated in Covered Risks 11,
> 13, and 14, after Date of Policy, against loss of damage, not exceeding the Amount of
> Insurance, sustained or incurred by the Insured by reason of:
> 1.    Title being vested other than as stated in Schedule A.
> 2.    Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is
> not limited to insurance against loss from
> (a) A defect in the Title caused by
> (i)  Forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
> (ii) Failure of any person or Entity to have authorized a transfer or conveyance;
> (iii) a document affecting Title not properly created, executed, witnessed, sealed
> acknowledged, notarized, or delivered;
> (iv) failure to perform those acts necessary to create a document by electronic means
> authorized by law;
> (v) a document executed under a falsified, expired, or otherwise invalid power of
> attorney;
> (vi) a document not properly filed, recorded, or indexed in the Public Records including
> failure to perform those acts by electronic means authorized by law; or
> (vii)     a defective judicial or administrative proceeding.
> (b) The lien of real estate taxes or assessments imposed on the Title by a governmental
> authority due or payable, but unpaid.
> (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance
> affecting the Title that would be disclosed by an accurate and complete land survey of the
> Land.   The term "encroachment" includes encroachments of existing improvements
> located on the Land onto adjoining land, and encroachments onto the Land of existing
> improvements located on adjoining land.

53.    First American failed to discover the Trustee's Deed, recorded February 12, 2007.

54.    The Trustee's Deed contained a Possibility of Reverter, as set forth above.

55.    The conditions giving rise to the Possibility of Reverter were triggered by Great

River's waste, which resulted in the Simmons threatening a declaratory judgment.

56.    Rather than contest the threatened declaratory judgment action, Great River

acknowledged that its failure to pay 2008 real estate taxes and association dues, which led to

liens being filed against the Property, and its failure to maintain the boilers on the Property,

constituted waste and neglect, triggering automatic acceleration of the Reversion Date.

57.     The Simmons and Great River then entered into the Reversion Agreement in which the parties agreed that the Reversion Date had accelerated automatically as per the Sale Agreement and the Trustee's Deed and that title to the Property reverted to the Simmons.

58.     In Paragraph 4(a)(vii) of the Reversion Agreement, Great River represented and warranted to the Simmons that it would convey and deliver the Property to the Simmons "free and clear of any liens, charges or encumbrances".   Moreover, Great River agreed to indemnify the Simmons "from and against all claims, demands, liabilities, causes of action, suits, judgments, damages and expenses relating to … any liens or financial obligations in connection with that certain Mortgage dated December 6, 2007 executed by [Great River] in favor of Meridian Bank."  The Simmons directed that title to the Property be conveyed to the Annuity Trust.

59.     Had First American disclosed the Trustee's Deed to Shamrock, Shamrock would not have issued Great River the Loan.

60.     First American has breached the Policy by refusing to pay the loss and has repudiated its obligation to pay said loss.

61.     Shamrock has incurred damages in the amount of $1.3 million as a result of First American's breach of contract.

62.     Moreover, the Policy states that if First American defends or prosecutes a against the insured, then the amount of insurance shall increase by 10%.

WHEREFORE, Plaintiff, Shamrock Bank of Florida, requests the Court enter judgment in its favor and against First American Title Ins. Co. in the amount of $1,430,000.00, and award Shamrock its costs of suit, prejudgment interest, reasonable attorney's fees and any other relief the court deems proper.

## COUNT II
### (Negligence)

63. Shamrock incorporates by reference all preceding allegations.

64. First American conducted a title search for the transaction to effectuate the loan between Great River and Meridian Bank and Shamrock.

65. First American issued a title commitment dated November 30, 2007 (the "Title Commitment").

66. First American had a duty to diligently search the Madison County records for all recorded encumbrances, liens and reverters.

67. First American breached its duty by failing to locate or identify the previously recorded Trustee's Deed containing the Possibility of Reverter.

68. Shamrock relied on the research conducted by First American and the representations made by First American in the Title Commitment.

69. The representation made by First American in the Title Commitment were inaccurate and/or misleading.

70. As a result of First American's failure to diligently search the Madison County records and locate the Trustee's Deed, Shamrock has suffered damages in the amount of $1.3 million.

WHEREFORE, Plaintiff, Shamrock Bank of Florida, requests the Court enter judgment in its favor and against First American Title Ins. Co. in the amount of $1.3 million, and award Shamrock its costs of suit, prejudgment interest, reasonable attorney's fees and any other relief the court deems proper.

Respectfully submitted,

BYRON CARLSON PETRI & KALB, LLC

By: _____

Christopher W. Byron, #6230810
411 Saint Louis Street
Edwardsville, Illinois 62025
Telephone:  (618) 655-0600
Facsimile:   (618) 655-4004
Attorneys for Plaintiff



**COMMITMENT FOR TITLE INSURANCE**

ISSUED BY

### FIRST AMERICAN TITLE INSURANCE COMPANY

Agreement to Issue Policy

We agree to issue a policy to you according to the terms of this Commitment. When we show the policy amount and your name as the proposed insured in Schedule A, this Commitment becomes effective as of the Commitment Date shown in Schedule A.

If the Requirements shown in this Commitment have not been met within six months after the Commitment Date, our obligation under this Commitment will end. Also, our obligation under this Commitment will end when the Policy is issued and then our obligation to you will be under the Policy.

Our obligation under this Commitment is limited by the following:

The Provisions in Schedule A.

The Exceptions in Schedule B.

The Conditions, Requirements and Standard Exceptions on the next page.

This Commitment is not valid without Schedule A and Schedule B.

*First American Title Insurance Company*

BY _Cart B. Johnson_   PRESIDENT

ATTEST _[signature]_   SECRETARY

**1**



EXHIBIT
A

## CONDITIONS

### 1. DEFINITIONS.
(a) "Mortgage" means mortgage, deed of trust or other security instrument.
(b) "Public Records" means title records that give constructive notice of matters affecting the title according to the state law where the land is located.

### 2. LATER DEFECTS.
The Exceptions in Schedule B may be amended to show any defects, liens or encumbrances that appear for the first time in the public records or are created or attach between the Commitment Date and the date on which all of the Requirements (a) and (c) shown below are met. We shall have no liability to you because of this amendment.

### 3. EXISTING DEFECTS
If any defects, liens or encumbrances existing at Commitment Date are not shown in Schedule B, we may amend Schedule B to show them. If we do amend Schedule B to show these defects, liens or encumbrances, we shall be liable to you according to Paragraph 4 below unless you knew of this information and did not tell us about it in writing.

### 4. LIMITATION OF OUR LIABILITY
Our only obligation is to issue to you the Policy referred to in this Commitment, when you have met its Requirements. If we have any liability to you for any loss you incur because of an error in this Commitment, our liability will be limited to your actual loss caused by your relying on this Commitment when you acted in good faith to:

comply with the Requirements shown below

or

eliminate with our written consent any Exceptions shown in
Schedule B or the Standard Exceptions noted below.

We shall not be liable for more than the Policy Amount show in Schedule A of this Commitment and our liability is subject to the terms of the Policy form to be issued to you.

### 5. CLAIMS MUST BE BASED ON THIS COMMITMENT
Any claim, whether or not based on negligence, which you may have against us concerning the title to the land must be based on this Commitment and is subject to its terms.

## REQUIREMENTS

The following requirements must be met:
(a)  Pay the agreed amounts for the interest in the land and/or the mortgage to be insured.
(b)  Pay us the premiums, fees and charges for the policy.
(c)  Documents satisfactory to us creating the interest in the land and/or the mortgage to be insured must be signed, delivered and recorded.
(d)  You must tell us in writing the name of anyone not referred to in this Commitment who will get an interest in the land or who will make a loan on the land. We may then make additional requirements or exceptions.
(e)  Proper documentation to dispose of such exceptions as you wish deleted from Schedule B or the Standard Exceptions noted below.

## STANDARD EXCEPTIONS

The following Standard Exceptions will be shown on your policy:
(1)  Rights or claims of parties in possession not shown by the public records.
(2)  Easements, or claims of easements, not shown by the public records.
(3)  Any encroachments, encumbrance, violation, variation or adverse circumstance affecting title that would be disclosed by an accurate and complete survey of the land pursuant to the "Minimum Standards of Practice," 68 Ia. Admin. Code, Sec. 1270.56(b)(6)(F) for residential property or the ALTA/ACSM land title survey standards for commercial/industrial property..
(4)  Any lien, or right to lien, for services, labor, or other material heretofore or hereafter furnished, imposed by law and not shown by the public records.
(5)  Taxes, or special assessments, if any, not shown as existing liens by the public records.
(6)  Loss or damage by reason of there being recorded in the public records, any deeds, mortgages, lis pendens, liens or other title encumbrances subsequent to the Commitment date and prior to the effective date of the final Policy.

2

**First American Title Insurance Company**
**#3 Club Centre Court, Suite A, Edwardsville, IL 62025**
**Phone (618)656-6618   Fax (618)656-6180**
**ALTA Commitment**
**Schedule A**

Reference: Great River Enterprises Limited

Loan Number: **Great River Enterprises Limited**

File No.: 1753426

1.     **Effective Date:** November 30, 2007

2.     **Policy or Policies to be issued:**                         Amount:

        **a. ALTA Owner's Policy**
             None                                                     None

             **Proposed Insured:**
             None

        **b. ALTA Loan Policy**
             ALTA Std Loan Policy 1056.06 (1) (2006)       $1,300,000.00

             **Proposed Insured:**
             Meridian Bank, its successors and/or assigns

3.     **The estate or interest in the land described or referred to in this commitment and**
        **covered herein is fee simple and title to the estate or interest in said land is at the**
        **effective date hereof vested in:**

        Great River Enterprises Limited Partnership No. 1, an Illinois limited partnership.

4.     **The mortgage and assignments, if any, covered by this Commitment are described as**
        **follows:**

        To Be Furnished

5.     The land referred to in this Commitment is described as follows:

Parcel 1:

Lots Numbered 11 and 12 in Fairmount, a subdivision in the Fractional Southwest Quarter of Section 3, Fractional Northwest Quarter of Section 10, Northeast Quarter of Section 10, and the Fractional Southeast Quarter of Section 4, all in Township 5 North, Range 10 West of the Third Principal Meridian, according to the plat thereof recorded in the Recorder's Office of Madison County, Illinois in Plat Book 14 Pages 2, 3, and 4;

Excepting therefrom a tract of land in Lots Numbered 11 and 12 in Fairmount, described as follows:

Commencing at the Southwest corner of Lot 11; thence North 55 degrees 24 minutes 6 seconds West, a distance of 69 feet to a point; thence Northwesterly along the West line of said Lot 11 a distance of 580.25 feet to the point of beginning; thence North 58 degrees 16 minutes 42 seconds East a distance of 389.13 feet to a point; thence Northeasterly to a point in the East line of Lot 12, which point is 100 feet South of the Northwest corner of Lot 13 (which point is located in the East line of said Lot 12); thence North along the East line of said Lot 12 to the Northeast corner thereof; thence Southwesterly along the North line of said Lots 12 and 11 to the Northwest corner of said Lot 11; thence Southerly along the West line of said Lot 11 to a point which is 580.25 feet North of the Southwest corner of said Lot 11, point of beginning, and as conveyed by Correction Quit Claim Deed to Heinz Peter as Trustee under Trust Agreement dated May 21, 1993, recorded January 21, 1998 in Book 4198 Page 0526 as Document No. 2346-139;

Retaining thereto a Scenic Easement over the Northerly part of Lot 11 excepted above for the direct benefit of the Southerly portion of said Lot 11 herein described; subject to the restrictions on said "Scenic Easement" as described and attached to the Quit Claim Deed recorded January 21, 1998 in Book 4198 Page 0526 as Document No. 2346-139.

Also excepting therefrom; Part of Lot 12 in Fairmount, described as follows:

Commencing at the Northwest corner of Lot 13 in said Fairmount Subdivision; thence South 34 degrees 23 minutes 08 seconds East along the line between Lots 12 and 13 in said Fairmount Subdivision a distance of 100 feet to the point of beginning of the tract herein described; thence continuing South 34 degrees 23 minutes 08 seconds East along said lot division line a distance of 248.36 feet; thence South 55 degrees 36 minutes 52 seconds West a distance of 240.0 feet; thence South 72 degrees 39 minutes 01 seconds West a distance of 215.64 feet to a point which is 389.13 feet North 58 degrees 16 minutes 42 seconds East of the Southwesterly line of said Lot 11; thence North 33 degrees 04 minutes 27 seconds East a distance of 483.08 feet to the point of beginning; and as conveyed by Quit Claim Deed to Heinz Peter as Trustee under Trust Agreement dated May 21, 1993, recorded January 21, 1998 in Book 4198 Page 0523 as Document No. 2346-138.

Situated in the County of Madison and State of Illinois.

Permanent Parcel No. 24-2-07-03-03-301-003

PARCEL 2:

Lots 1 and 2 in the Final Plat of Heinz Peter Subdivision, as per plat thereof recorded in Plat Book 60 Page 135, being a resubdivision of Lot 13 and Part of Lots 11 and 12

4

In Fairmount located in Section 3 and 4, Township 5 North, Range 10 West of the Third Principal Meridian, Godfrey, Madison County, Illinois.

Situated in Madison County, Illinois.

Also,

That tract of land situated and being part of the Southeast Quarter of Section 4, Township 5 North, Range 10 West of the Third Principal Meridian, Madison County, Illinois, described as follows:
Beginning at a point on the Southerly line of the Hop-Hollow Road, so-called, said point being 372 feet South 48 degrees 40 minutes West, from where to Section line running North and South, between Sections 3 and 4, would intersect the Southerly line of said Hop-Hollow Road; thence from said beginning point South 35 degrees 13 minutes West 316 feet to a point; thence South 43 degrees 28 minutes West 131 feet to a point; thence South 25 degrees 13 minutes West 140 feet to a point; thence South 16 degrees 21 minutes West 200 feet to a point; thence South 8 degrees 9 minutes East 188 feet to the Northerly line of the right of way of the Chicago, Peoria and St. Louis Railway; thence Northwesterly along the Northerly line of said right of way 441 feet to a point 50 feet Northerly from center of railroad bridge; thence Northeasterly 949 feet more or less to point of beginning; Excepting such portions or parts of said tract of land as are parts of a certain public road known as the Alton Hop-Hollow Road, or any other road, or land lying herein, formerly dedicated as a public road or highway, not intending to convey any land heretofore conveyed to Virginia Job Bowman.

Situated in the County of Madison and State of Illinois.

Permanent Parcel No. 24-2-07-03-03-301-034 (Part of Lot 2)
Permanent Parcel No. 24-1-07-04-00-000-020 (adjacent tract)
Permanent Parcel No. 24-2-07-03-03-301-033 (Lot 1)
Permanent Parcel No. 24-2-07-04-00-000-018 (Part of Lot 2)

Note: For informational purposes only, the land is known as:

12 Danforth Road
Alton, IL 62002

THIS COMMITMENT IS VALID ONLY IF SCHEDULE B IS ATTACHED.

5

**ALTA Commitment**

**Schedule B**

**Part I**

File No.:   1753426

Schedule B of the policy or policies to be issued will contain the exceptions shown on the inside front cover of this Commitment and the following exceptions, unless same are disposed of to the satisfaction of the Company:

If any document referenced herein contains a covenant, condition or restriction violative of 42USC 3604(c), such covenant, condition or restriction to the extent of such violation is hereby deleted.

1.   Rights or claims of parties in possession not shown by the public records.

2.   Easements or claims of easements, not shown by the public records.

3.   Any encroachments, encumbrance, violation, variation or adverse circumstance affecting title that would be disclosed by an accurate survey of the land pursuant to the "Minimum Standards of Practice," 68 Ill. Admin Code, Sec. 1270.56(b)(6)(P) for residential property or the ALTA/ACSM land title survey standards for commercial/industrial property.

4.   Any lien, or right to lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

5.   Taxes, or special assessments, if any, not shown as existing liens by the public records.

6.   Loss or damage by reason of there being recorded in the public records, any deeds, mortgages, lis pendens, liens or other title encumbrances subsequent to the Commitment date and prior to the effective date of the final Policy.

7.   General taxes and assessments for the year , 2007 and subsequent years which are not yet due and payable.

   Tax identification no.:  24-2-07-03-03-301-003
   (Affects Parcel 1)

   Note for informational purposes 2006 taxes:

   1st Installment in the amount of $19,745.76 with a status of PAID.  (Due Date  07/05/2007)
   2nd Installment in the amount of $19,745.73 with a status of PAID.  (Due Date 09/05/2007)

   Note:  If applicable, an original tax bill must be presented if taxes are to be paid at time of closing.

8.   General taxes and assessments for the year , 2007 and subsequent years which are not yet due and payable.

   Tax identification no.:  24-2-07-03-03-301-033 (Lot 1)
   (Parcel 2)

6

Note for informational purposes 2006 taxes:

1st Installment in the amount of $723.85 with a status of PAID. (Due Date 07/05/2007)
2nd Installment in the amount of $723.80 with a status of PAID. (Due Date 09/05/2007)

Note: If taxes are to be paid at time of closing, an original tax bill must be presented.

9.  General taxes for the year , 2007 and subsequent years which are not yet due and payable.

Tax identification no.: 24-2-07-04-000-018 (Part Lot 2)
(Parcel 2)

Note for informational purposes 2006 taxes:

1st Installment in the amount of $723.85 with a status of PAID. (Due Date 07/05/2007)
2nd Installment in the amount of $723.80 with a status of PAID. (Due Date 09/05/2007)

Note: If taxes are to be paid at time of closing, an original tax bill must be presented.

10.  General taxes for the year , 2007 and subsequent years.

Tax identification no.: 24-2-07-03-03-301-034 (Part Lot 2)
(Parcel 2)

Note for informational purposes 2006 taxes:

1st Installment in the amount of $1,488.89 with a status of PAID. (Due Date 07/05/2007)
2nd Installment in the amount of $1,488.83 with a status of PAID. (Due Date 09/05/2007)

Note: If taxes are to be paid at time of closing, an original tax bill must be presented.

11.  General taxes for the year , 2007 and subsequent years.

Tax identification no.: 24-1-07-04-00-000-020 (Adjacent Tract)
(Parcel 2)

Note for informational purposes 2006 taxes:

1st Installment in the amount of $723.85 with a status of PAID. (Due Date 07/05/2007)
2nd Installment in the amount of $723.80 with a status of PAID. (Due Date 09/05/2007)

Note: If taxes are to be paid at time of closing, an original tax bill must be presented.

12.  The application states that this transaction is to be a refinance. Yet, we find no existing first mortgage of record. Therefore, the facts and circumstances surrounding this transaction must be explained. Relative thereto, this commitment is subject to any further exceptions, if any, that may then be deemed necessary.

13.  The claims of any and all present and future creditors of Great River Enterprises Limited Partnership No. 1.

14.  Terms, powers, provisions and limitations of the partnership agreement under which title is held.

7

15. The partnership agreement establishing the partnership of Great River Enterprises Limited Partnership No. 1, together with all amendments thereto, properly identified in writing by all the partners of the agreement under which the partnership acquired and holds title, should be furnished; and this commitment is subject to such further exceptions, if any, as may then be deemed necessary. Note: this commitment is subject to such further exceptions, if any, which may be disclosed after a name search has been made for judgments and other matters against all the members of the partnership of Great River Enterprises Limited Partnership No. 1.

General Exception:

Any easements or servitudes appearing in the public records. The insured lender is insured that none of the improvements encroach upon the easements and that any use of the easements for purposes granted or reserved will not interfere with or damage the improvements, including lawns, shrubbery and trees.

Covenants, conditions and restrictions, if any, appearing in the public records. The insured lender is insured that the same have not been violated, except that such affirmative assurance does not extend to covenants, conditions and restrictions relating to environmental protection unless a notice of violation thereof has been recorded or filed in the public records and is not referenced herein. Further, the insured lender is insured that any future violation of any covenants, conditions and restrictions appearing in the public records will not result in forfeiture or reversion of title, and that there are no provisions therein under which the lien of the insured mortgage can be extinguished, subordinated or impaired.

NOTE for informational purposes: The final 2006 ALTA Policy issued will contain an arbitration provision. When the Amount of Insurance is $2,000,000 or less, all arbitral matters in dispute shall be arbitrated at the option of either the Company or the Insured and will be the exclusive remedy available to the Parties. You may review a copy of the arbitration rules at http://www.alta.org.

**End of Schedule B – Part I**

8

 

**First American**

114 E. 5th Street,
Santa Ana CA 92701
Tel: 7142501052 Fax:

**Madison**

* 0 0 0 0 3 5 4 0 5 1 0 0 2 5 1 9 8 0 *

**Transmittal**
Order No: 1753426

Dated: 1/7/2008

Attention:
Meridian Bank
200 W 3rd St
Alton , IL  62002

Enclosed please find 1 attached documents.

Page Count 14



Form No. 1056.06
ALTA Loan Policy (6-17-06)
1100301P050600



Policy Page 1
Policy Number: 1753426

# LOAN POLICY OF TITLE INSURANCE

## ISSUED BY

## *First American Title Insurance Company*

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at the address shown in Section 17 of the Conditions.

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation (the "Company") insures as of Date of Policy and, to the extent stated in Covered Risks 11, 13, and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
   (a) A defect in the Title caused by
      (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii) failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
      (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;
      (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
3. Unmarketable Title.
4. No right of access to and from the Land.
5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (a) the occupancy, use, or enjoyment of the Land;
   (b) the character, dimensions, or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection
   if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.
6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.
7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.
8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.
9. The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title. This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage
   (a) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
   (b) failure of any person or Entity to have authorized a transfer or conveyance;
   (c) the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
   (d) failure to perform those acts necessary to create a document by electronic means authorized by law;
   (e) a document executed under a falsified, expired, or otherwise invalid power of attorney;

(f) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
(g) a defective judicial or administrative proceeding.
10. The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.
11. The lack of priority of the lien of the Insured Mortgage upon the Title
    (a) as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an improvement or work related to the Land when the improvement or work is either
       (i) contracted for or commenced on or before Date of Policy; or
       (ii) contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secured by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and
    (b) over the lien of any assessments for street improvements under construction or completed at Date of Policy.
12. The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens.
13. The invalidity, unenforceability, lack of priority, or avoidance of the lien of the Insured Mortgage upon the Title
    (a) resulting from the avoidance in whole or in part, or from a court order providing an alternative remedy, of any transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction creating the lien of the Insured Mortgage because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or
    (b) because the Insured Mortgage constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records
       (i) to be timely, or
       (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.
14. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the Insured Mortgage in the Public Records.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this policy, but only to the extent provided in the Conditions.

*First American Title Insurance Company*

BY _____   PRESIDENT

ATTEST _____   SECRETARY



12-L-____

Form No. 1056.06
ALTA Loan Policy (6-17-06)

Policy Page 2
Policy Number: 1753426

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

## CONDITIONS

### 1. DEFINITION OF TERMS

The following terms when used in this policy mean:

(a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b) or decreased by Section 10 of these Conditions.
(b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.
(c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.
(d) "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of
   (i) the amount of the principal disbursed as of Date of Policy;
   (ii) the amount of the principal disbursed subsequent to Date of Policy;
   (iii) the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance;
   (iv) interest on the loan;
   (v) the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;
   (vi) the expenses of foreclosure and any other costs of enforcement;
   (vii) the amounts advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of the estate or interest in the Title;
   (viii) the amounts to pay taxes and insurance; and
   (ix) the reasonable amounts expended to prevent deterioration of improvements;
   but the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.
(e) "Insured": The Insured named in Schedule A.
   (i) The term "Insured" also includes
      (A) the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is an obligor under the provisions of Section 12(c) of these Conditions;
      (B) the person or Entity who has "control" of the "transferable record," if the Indebtedness is evidenced by a "transferable record," as these terms are defined by applicable electronic transactions law;
      (C) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;
      (D) successors to an Insured by its conversion to another kind of Entity;
      (E) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title
         (1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,
         (2) if the grantee wholly owns the named Insured, or
         (3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity;
      (F) any government agency or instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the Indebtedness secured by the Insured Mortgage, or any part of it, whether named as an Insured or not;
   (ii) With regard to (A), (B), (C), (D), and (E) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, or other matter insured against by this policy.
(f) "Insured Claimant": An Insured claiming loss or damage.
(g) "Insured Mortgage": The Mortgage described in paragraph 4 of Schedule A.
(h) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.
(i) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is Insured by this policy.
(j) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.
(k) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.
(l) "Title": The estate or interest described in Schedule A.
(m) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

### 2. CONTINUATION OF INSURANCE

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

Form No. 1056.06
ALTA Loan Policy (6-17-06)

**3.   NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT**

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as Insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as Insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

**4.   PROOF OF LOSS**

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

**5.   DEFENSE AND PROSECUTION OF ACTIONS**

(a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as Insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c) Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

**6.   DUTY OF INSURED CLAIMANT TO COOPERATE**

(a) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as Insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b) The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage.

All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

**7.   OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i) To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

(ii) To purchase the Indebtedness for the amount of the Indebtedness on the date of purchase, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of purchase and that the Company is obligated to pay.

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the purchase by the Company of either of the options provided for in subsections (a)(i) or (ii), all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in those subsections, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b) To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii) to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

**8.   DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i) the Amount of Insurance,

(ii) the Indebtedness,

(iii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv) if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

(i) the Amount of Insurance shall be increased by 10%, and

(ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In the event the Insured has acquired the Title in the manner described in Section 2 of these Conditions or has conveyed the Title, then the extent of liability of the Company shall continue as set forth in Section 8(a) of these Conditions.

Form No. 1056.06
ALTA Loan Policy (6-17-06)

Policy Page 4
Policy Number: 1753426

(d)  In addition to the extent of liability under (a), (b), and (c), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

**9.   LIMITATION OF LIABILITY**

(a)  If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b)  In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as insured.

(c)  The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

**10.   REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a)  All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b)  The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

**11.   PAYMENT OF LOSS**

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

**12.   RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT**

(a)  The Company's Right to Recover

Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b)  The Insured's Rights and Limitations

(i)  The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.

(ii)  If the Insured exercises a right provided in (b)(i), but has Knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c)  The Company's Rights Against Noninsured Obligors

The Company's right of subrogation includes the Insured's rights against noninsured obligors including the rights of the Insured to indemnities,

guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights. The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section 1(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

**13.   ARBITRATION**

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**14.   LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT**

(a)  This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b)  Any claim of loss or damage that arises out of the status of the Title or lien of the Insured Mortgage or by any action asserting such claim shall be restricted to this policy.

(c)  Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d)  Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

**15.   SEVERABILITY**

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

**16.   CHOICE OF LAW; FORUM**

(a)  Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b)  Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a State or federal court within the United States of America or its territories having appropriate jurisdiction.

**17.   NOTICES, WHERE SENT**

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at 1 First American Way, Santa Ana, CA 92707, Attn: Claims Department.

# POLICY OF TITLE INSURANCE



Form No. 1056.06
ALTA Loan Policy (6-17-06)

Policy Page 5
Policy Number: 1753426

# SCHEDULE A

## *First American Title Insurance Company*

Name and Address of Title Insurance Company:
First American Title Insurance Company
1 First American Way
Santa Ana, CA 92707

File No.: **1753426**

Policy No.: **1753426**

Amount of Insurance:  $1,300,000.00
Date of Policy:  December 11, 2007 at 8:00 a.m.

1.    Name of Insured:

Meridian Bank, its successors and assigns, as their interests may appear, as defined in the paragraph entitled "Definitions of Terms" contained in this Policy.

2.    The estate or interest in the Land that is encumbered by the Insured Mortgage/Trust Deed is:

Fee Simple

3.    Title is vested in:

Great River Enterprises Limited Partnership No. 1, an Illinois limited partnership

4.    The Insured Mortgage, and its assignments, if any, or Insured Trust Deed is described as follows:

Mortgage/Trust Deed
Mortgagor/Trustor:   Great River Enterprises Limited Partnership No. 1
Mortgagee/Trustee:   Meridian Bank
Original Amount:     $1,300,000.00
Dated:               December 06, 2007
Recorded:            December 11, 2007
Document No.:        2007R63368

5.    The Land referred to in this policy is described as follows:

Real property in the City of Alton, County of Madison, State of Illinois, described as follows:

Parcel 1:

Lots Numbered 11 and 12 in Fairmount, a subdivision in the Fractional Southwest Quarter of Section 3, Fractional Northwest Quarter of Section 10, Northeast Quarter of Section 10, and the Fractional Southeast Quarter of Section 4, all in Township 5 North, Range 10 West of the Third Principal Meridian, according to the plat thereof recorded in the Recorder's Office of Madison County, Illinois in Plat Book 14 Pages 2, 3, and 4;

Excepting therefrom a tract of land in Lots Numbered 11 and 12 in Fairmount, described as follows:

Commencing at the Southwest corner of Lot 11; thence North 55 degrees 24 minutes 6 seconds West, a distance of 69 feet to a point; thence Northwesterly along the West line of said Lot 11 a

Form No. 1056.06
ALTA Loan Policy (6-17-06)

Policy Page 6
Policy Number: 1753426

distance of 580.25 feet to the point of beginning; thence North 58 degrees 16 minutes 42 seconds East a distance of 389.13 feet to a point; thence Northeasterly to a point in the East line of Lot 12, which point is 100 feet South of the Northwest corner of Lot 13 (which point is located in the East line of said Lot 12); thence North along the East line of said Lot 12 to the Northeast corner thereof; thence Southwesterly along the North line of said Lots 12 and 11 to the Northwest corner of said Lot 11; thence Southerly along the West line of said Lot 11 to a point which is 580.25 feet North of the Southwest corner of said Lot 11, point of beginning, and as conveyed by Correction Quit Claim Deed to Heinz Peter as Trustee under Trust Agreement dated May 21, 1993, recorded January 21, 1998 in Book 4198 Page 0526 as Document No. 2346-139;

Retaining thereto a Scenic Easement over the Northerly part of Lot 11 excepted above for the direct benefit of the Southerly portion of said Lot 11 herein described; subject to the restrictions on said "Scenic Easement" as described and attached to the Quit Claim Deed recorded January 21, 1998 in Book 4198 Page 0526 as Document No. 2346-139.

Also excepting therefrom; Part of Lot 12 in Fairmount, described as follows:

Commencing at the Northwest corner of Lot 13 in said Fairmount Subdivision; thence South 34 degrees 23 minutes 08 seconds East along the line between Lots 12 and 13 in said Fairmount Subdivision a distance of 100 feet to the point of beginning of the tract herein described; thence continuing South 34 degrees 23 minutes 08 seconds East along said lot division line a distance of 248.36 feet; thence South 55 degrees 36 minutes 52 seconds West a distance of 240.0 feet; thence South 72 degrees 39 minutes 01 seconds West a distance of 215.64 feet to a point which is 389.13 feet North 58 degrees 16 minutes 42 seconds East of the Southwesterly line of said Lot 11; thence North 33 degrees 04 minutes 27 seconds East a distance of 483.08 feet to the point of beginning; and as conveyed by Quit Claim Deed to Heinz Peter as Trustee under Trust Agreement dated May 21, 1993, recorded January 21, 1998 in Book 4198 Page 0523 as Document No. 2346-138.

Situated in the County of Madison and State of Illinois.

Permanent Parcel No. 24-2-07-03-03-301-003

PARCEL 2:

Lots 1 and 2 in the Final Plat of Heinz Peter Subdivision, as per plat thereof recorded in Plat Book 60 Page 135, being a resubdivision of Lot 13 and Part of Lots 11 and 12 in Fairmount located in Section 3 and 4, Township 5 North, Range 10 West of the Third Principal Meridian, Godfrey, Madison County, Illinois.

Situated in Madison County, Illinois.

Also,

That tract of land situated and being part of the Southeast Quarter of Section 4, Township 5 North, Range 10 West of the Third Principal Meridian, Madison County, Illinois, described as follows:
Beginning at a point on the Southerly line of the Hop-Hollow Road, so-called, said point being 372 feet South 48 degrees 40 minutes West, from where to Section line running North and South, between Sections 3 and 4, would intersect the Southerly line of said Hop-Hollow Road; thence from said beginning point South 35 degrees 13 minutes West 316 feet to a point; thence South 43 degrees 28 minutes West 131 feet to a point; thence South 25 degrees 13 minutes West 140 feet to a point; thence South 26 degrees 21 minutes West 200 feet to a point; thence South 8 degrees 9 minutes East 188 feet to the Northerly line of the right of way of the Chicago, Peoria and St. Louis Railway; thence Northwesterly along the Northerly line of said right of way 441 feet to a point 50 feet Northerly from center of railroad bridge; thence Northeasterly 949 feet more or less to point of beginning; Excepting such portions or parts of said tract of land as are parts of a certain public road known as the Alton Hop-Hollow Road, or any other road, or land lying herein, formerly dedicated as a public road or highway, not intending to convey any land

Form No. 1056.06
ALTA Loan Policy (6-17-06)

Policy Page 7
Policy Number: 1753426

heretofore conveyed to Virginia Job Bowman.

Situated in the County of Madison and State of Illinois.

Permanent Parcel No. 24-2-07-03-03-301-034 (Part of Lot 2)
Permanent Parcel No. 24-1-07-04-00-000-020 (adjacent tract)
Permanent Parcel No. 24-2-07-03-03-301-033 (Lot 1)
Permanent Parcel No. 24-2-07-04-00-000-018 (Part of Lot 2)

6.   This policy incorporates by reference those ALTA endorsements selected below:

[     ] 4-06          (Condominium)
[     ] 4.1-06
[     ] 5-06          (Planned Unit Development)
[     ] 5.1-06
[     ] 6-06          (Variable Rate)
[     ] 6.2-06        (Variable Rate--Negative Amortization)
[  X  ] 8.1-06        (Environmental Protection Lien) Paragraph b refers to the following state
                     statute(s): 65ILCS 5/11-31-1-(f)
[  X  ] 9-06          (Restrictions, Encroachments, Minerals)
[     ] 13.1-06       (Leasehold Loan)
[     ] 14-06         (Future Advance-Priority)
[     ] 14.1-06       (Future Advance-Knowledge)
[     ] 14.3-06       (Future Advance-Reverse Mortgage)
[  X  ] 22-06         (Location) The type of improvement is a Single Family Residence, and the street
                     address is shown above.

By:

Authorized Signatory

Form No. 1056.06
ALTA Loan Policy (6-17-06)

Policy Page 8
Policy Number: 1753426

# SCHEDULE B

File No.: **1753426**                                    Policy No.: **1753426**

## EXCEPTIONS FROM COVERAGE

This Policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

## PART I

**Section One:**

1. Rights or claims of parties in possession not shown by the public records.

2. Easements, or claims of easements, not shown by the Public Records.

3. Any encroachments, encumbrance, violation, variation or adverse circumstance affecting title that would be disclosed by an accurate and complete survey of the land pursuant to the "Minimum Standards of Practice," 68 Ill. Admin. Code, Sec. 1270.56(b)(6)(P) for residential property or the ALTA/ACSM land title survey standards for commercial/industrial property.

4. Any lien, or right to lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

5. Taxes, or special assessments, if any, not shown as existing liens by the Public Records.

6. Loss or damage by reason of there being recorded in the public records, any deeds, mortgages, lis pendens, liens or other title encumbrances subsequent to the Commitment date and prior to the effective date of the final Policy.

**Section Two:**

1. General taxes and assessments for the year 2007, and subsequent years which are not yet due and payable.

   Tax identification no.: 24-2-07-03-03-301-003 (Parcel 1), 24-2-07-03-03-301-033 (Lot 1) (Parcel 2), 24-2-07-04-000-018 (Part Lot 2) (Parcel 2), 24-2-07-03-03-301-034 (Part Lot 2) (Parcel 2), 24-1-07-04-00-000-020 (Adjacent Tract), (Parcel 2)

**End Schedule B - Part I**

Form No. 1056.06
ALTA Loan Policy (6-17-06)

# SCHEDULE B

File No.: **1753426**                           Policy No.: **1753426**

## PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:

None

### End Schedule B – Part II

Form No. 1056.06
ALTA Loan Policy (6-17-06)

Policy Page 10
Policy Number: 1753426

## ENDORSEMENT

### Attached to Policy No. 1753426

### Issued by

### *First American Title Insurance Company*

The insurance afforded by this endorsement is only effective if the Land is used or is to be used primarily for residential purposes.

The Company insures against loss or damage sustained by the Insured by reason of lack of priority of the lien of the Insured Mortgage over

(a)   any environmental protection lien that, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge, or is filed in the records of the clerk of the United States district court for the district in which the Land is located, except as set forth in Schedule B; or

(b)   any environmental protection lien provided by any state statute in effect at Date of Policy, except environmental protection liens provided by the following state statutes: **None**

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

American Land Title Association
Endorsement 8.1-06 (Environmental Protection Lien)
Adopted 6/17/06

By:
    Authorized Signatory

Form No. 1056.06
ALTA Loan Policy (6-17-06)

Policy Page 11
Policy Number: 1753426

## ENDORSEMENT

### Attached to Policy No. 1753426

### Issued by

### *First American Title Insurance Company*

The Company insures the owner of the Indebtedness secured by the Insured Mortgage against loss or damage sustained by reason of:

1.     The existence, at Date of Policy, of any of the following:
    a.     Covenants, conditions, or restrictions under which the lien of the Insured Mortgage can be divested, subordinated, or extinguished, or its validity, priority, or enforceability impaired.
    b.     Unless expressly excepted in Schedule B
        i.     Present violations on the Land of any enforceable covenants, conditions, or restrictions, or existing improvements on the land described in Schedule A that violate any building setback lines shown on a plat of subdivision recorded or filed in the Public Records.
        ii.     Any instrument referred to in Schedule B as containing covenants, conditions, or restrictions on the Land that, in addition, (A) establishes an easement on the Land, (B) provides a lien for liquidated damages, (C) provides for a private charge or assessment, (D) provides for an option to purchase, a right of first refusal, or the prior approval of a future purchaser or occupant.
        iii.     Any encroachment of existing improvements located on the Land onto adjoining land, or any encroachment onto the Land of existing improvements located on adjoining land.
        iv.     Any encroachment of existing improvements located on the Land onto that portion of the Land subject to any easement excepted in Schedule B.
        v.     Any notices of violation of covenants, conditions, or restrictions relating to environmental protection recorded or filed in the Public Records.

2.     Any future violation on the Land of any existing covenants, conditions, or restrictions occurring prior to the acquisition of title to the estate or interest in the Land by the Insured, provided the violation results in:
    a.     the invalidity, loss of priority, or unenforceability of the lien of the Insured Mortgage; or
    b.     the loss of Title if the Insured shall acquire Title in satisfaction of the Indebtedness secured by the Insured Mortgage.

3.     Damage to existing improvements, including lawns, shrubbery, or trees:
    a.     that are located on or encroach upon that portion of the Land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved;
    b.     resulting from the future exercise of any right to use the surface of the Land for the extraction or development of minerals excepted from the description of the Land or excepted in Schedule B.

4.     Any final court order or judgment requiring the removal from any land adjoining the Land of any encroachment excepted in Schedule B.

5.     Any final court order or judgment denying the right to maintain any existing improvements on the Land because of any violation of covenants, conditions, or restrictions, or building setback lines shown on a plat of subdivision recorded or filed in the Public Records.

Form No. 1056.06
ALTA Loan Policy (6-17-06)

Wherever in this endorsement the words "covenants, conditions, or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions, or limitations contained in an instrument creating a lease.

As used in paragraphs 1.b.i. and 5, the words "covenants, conditions, or restrictions" do not include any covenants, conditions, or restrictions (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded or filed in the Public Records at Date of Policy and is not excepted in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

American Land Title Association
Endorsement 9-06 (Restrictions, Encroachments, Minerals)
Adopted 6/17/06

By:

Authorized Signatory

Form No. 1056.06
ALTA Loan Policy (6-17-06)

Policy Page 13
Policy Number: 1753426

## ENDORSEMENT

### Attached to Policy No. 1753426

### Issued by

## *First American Title Insurance Company*

The Company insures against loss or damage sustained by the Insured by reason of the failure of a **Single Family Residence**, known as **12 Danforth Road, Alton, IL 62002**, to be located on the Land at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

American Land Title Association
Endorsement 22-06 (Location)
Adopted 6/17/06

By:

Authorized Signatory

2009R15103

STATE OF ILLINOIS
MADISON COUNTY
FILED FOR RECORD IN
THE RECORDERS OFFICE

03/26/2009    03:21PM

Prepared By and Return To:
Deann Anderson
FH Partners LLC
Post Office Box 8216
Waco, Texas 76714-8216
(254) 761-2800

DANIEL R. DONOHOO
RECORDER

REC FEE:    19.00
RHSPS FEE:  10.00
PAGES:      5

Sort No.: 53.01
Asset Name: **Great River Enterprises Limited Partnership No. 1**
FCSC Asset No.: 3386053100
Property Location: Alton, Madison IL 62002

## ASSIGNMENT OF LOAN AND LIENS

29.00 ck
211(1)

        **Federal Deposit Insurance Corporation, as Receiver for Meridian Bank** (the "Assignor"), having an address, for purposes of this Assignment, of 1601 Bryan Street, Dallas, Texas 75201, hereby sells, transfers, assigns, and conveys to FH Partners LLC (the "Assignee"), a Texas limited liability company, having an address of P.O. Box 8216, 6400 Imperial Drive (delivery only), Waco, Texas 76714-8216, without recourse or warranty, express or implied, except only as specifically provided in that certain Loan Sale Agreement dated February 13, 2009, by and among Assignor and Assignee (the "Agreement"), all right, title, and interest in the Loans (as such term is defined in the Agreement) (whether one or more, herein so called) identified in <u>Attachment I</u>, attached hereto and made a part hereof, together with, and all documents and instruments evidencing, securing, governing and guaranteeing the indebtedness evidenced by the Assets and all renewals, modifications, amendments, supplements and restatements thereof (collectively, the "Collateral Documents"), including, without limitation, those more specifically described in <u>Attachment I</u>.

        THIS   ASSIGNMENT   IS   MADE   WITHOUT   RECOURSE, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, BY THE FDIC IN ITS CORPORATE CAPACITY OR AS RECEIVER

        **IN WITNESS WHEREOF,** this Assignment of Loan and Liens is executed effective as of February 13, 2009.

        **ASSIGNOR:**

        **Federal Deposit Insurance Corporation, as Receiver for Meridian Bank**

        By: _Deborah Butler_
        Name:   Deborah Butler
        Title:    Attorney-in-Fact

EXHIBIT
C

THE STATE OF TEXAS
COUNTY OF MCLENNAN

     BEFORE ME, the undersigned, a Notary Public in and for said county and state, on this day personally appeared Deborah Butler, who is the Attorney-in-Fact for Federal Deposit Insurance Corporation, as Receiver for Meridian Bank, pursuant to that certain Limited Power of Attorney dated February 12, 2009 and filed March 4, 2009 in McLennan County, Texas as Instrument number 2009006322, known to me to be the person whose name is subscribed to the foregoing instrument, and she acknowledged to me that she executed the same for the purposes and consideration therein expressed, as the act and deed of said bank and in the capacity therein stated.

     Given under my hand and seal of office this 18th day of March, 2009

Notary Public, State of Texas

## **Attachment I**

Asset Name:      Great River Enterprises Limited Partnership No. 1

Purchaser's Asset No.:      3386053100

Property Location:      Alton, Madison IL 62002

Universal Note dated December 06, 2007, in the original principal amount of $1,300,000.00, executed by Great River Enterprises Limited Partnership No. 1 payable to the order of Meridian Bank.

Mortgage (With Future Advance Clause) dated December 06, 2007 executed by Great River Enterprises Limited Partnership No. 1 in favor of Meridian Bank in the amount of $1,300,000.00 recorded on December 11, 2007 as No. 2007R63368 in the Office of the Recorder, Madison County, State of Illinois.

Attachment I to Assignment of Loan and Liens

 EXHIBIT A 

Parcel 1:

Lots Numbered 11 and 12 in Fairmount, a subdivision in the Fractional Southwest Quarter of Section 3, Fractional Northwest Quarter of Section 10, Northeast Quarter of Section 10, and the Fractional Southeast Quarter of Section 4, all in Township 5 North, Range 10 West of the Third Principal Meridian, according to the plat thereof recorded in the Recorder's Office of Madison County, Illinois in Plat Book 14 Pages 2, 3, and 4;

Excepting therefrom a tract of land in Lots Numbered 11 and 12 in Fairmount, described as follows:

Commencing at the Southwest corner of Lot 11; thence North 55 degrees 24 minutes 6 seconds West, a distance of 69 feet to a point; thence Northwesterly along the West line of said Lot 11 a distance of 580.25 feet to the point of beginning; thence North 58 degrees 16 minutes 42 seconds East a distance of 389.13 feet to a point; thence Northeasterly to a point in the East line of Lot 12, which point is 100 feet South of the Northwest corner of Lot 13 (which point is located in the East line of said Lot 12); thence North along the East line of said Lot 12 to the Northeast corner thereof; thence Southwesterly along the North line of said Lots 12 and 11 to the Northwest corner of said Lot 11; thence Southerly along the West line of said Lot 11 to a point which is 580.25 feet North of the Southwest corner of said Lot 11, point of beginning, and as conveyed by Correction Quit Claim Deed to Heinz Peter as Trustee under Trust Agreement dated May 21, 1993, recorded January 21, 1998 in Book 4198 Page 0526 as Document No. 2346-139;

Retaining thereto a Scenic Easement over the Northerly part of Lot 11 excepted above for the direct benefit of the Southerly portion of said Lot 11 herein described; subject to the restrictions on said "Scenic Easement" as described and attached to the Quit Claim Deed recorded January 21, 1998 in Book 4198 Page 0526 as Document No. 2346-139.

Also excepting therefrom: Part of Lot 12 in Fairmount, described as follows:

Commencing at the Northwest corner of Lot 13 in said Fairmount Subdivision; thence South 34 degrees 23 minutes 08 seconds East along the line between Lots 12 and 13 in said Fairmount Subdivision a distance of 100 feet to the point of beginning of the tract herein described; thence continuing South 34 degrees 23 minutes 08 seconds East along said lot division line a distance of 248.36 feet; thence South 55 degrees 36 minutes 52 seconds West a distance of 240.0 feet; thence South 72 degrees 39 minutes 01 seconds West a distance of 215.64 feet to a point which is 389.13 feet North 58 degrees 16 minutes 42 seconds East of the Southwesterly line of said Lot 11; thence North 33 degrees 04 minutes 27 seconds East a distance of 483.08 feet to the point of beginning; and as conveyed by Quit Claim Deed to Heinz Peter as Trustee under Trust Agreement dated May 21, 1993, recorded January 21, 1998 in Book 4198 Page 0523 as Document No. 2346-138.

Situated in the County of Madison and State of Illinois.

Permanent Parcel No. 24-2-07-03-03-301-003

PARCEL 2:

Lots 1 and 2 in the Final Plat of Heinz Peter Subdivision, as per plat thereof recorded in Plat Book 60 Page 135, being a resubdivision of Lot 13 and Part of Lots 11 and 12

12-L-____

 EXHIBIT A CONT. 

in Fairmount located in Section 3 and 4, Township 5 North, Range 10 West of the Third Principal Meridian, Godfrey, Madison County, Illinois.

Situated in Madison County, Illinois.

Also,

That tract of land situated and being part of the Southeast Quarter of Section 4, Township 5 North, Range 10 West of the Third Principal Meridian, Madison County, Illinois, described as follows:
Beginning at a point on the Southerly line of the Hop-Hollow Road, so-called, said point being 372 feet South 48 degrees 40 minutes West, from where a Section line running North and South, between Sections 3 and 4, would intersect the Southerly line of said Hop-Hollow Road; thence from said beginning point South 35 degrees 13 minutes West 316 feet to a point; thence South 43 degrees 28 minutes West 131 feet to a point; thence South 25 degrees 13 minutes West 140 feet to a point; thence South 26 degrees 21 minutes West 200 feet to a point; thence South 8 degrees 9 minutes East 188 feet to the Northerly line of the right of way of the Chicago, Peoria and St. Louis Railway; thence Northwesterly along the Northerly line of said right of way 441 feet to a point 50 feet Northerly from center of railroad bridge; thence Northeasterly 949 feet more or less to point of beginning; Excepting such portions or parts of said tract of land as are parts of a certain public road known as the Alton Hop-Hollow Road, or any other road, or land lying herein, formerly dedicated as a public road or highway, not intending to convey any land heretofore conveyed to Virginia Job Bowman.

Situated in the County of Madison and State of Illinois.

Permanent Parcel No. 24-2-07-03-03-301-034 (Part of Lot 2)
Permanent Parcel No. 24-1-07-04-00-000-020 (adjacent tract)
Permanent Parcel No. 24-2-07-03-03-301-033 (Lot 1)
Permanent Parcel No. 24-2-07-04-00-000-018 (Part of Lot 2)

Note: For informational purposes only, the land is known as:

12 Danforth Road
Alton, IL 62002

# END OF DOCUMENT

# LOAN SALE AGREEMENT

This LOAN SALE AGREEMENT (this "**Agreement**") is entered into to be effective the 4th day of November, 2009 (the "**Effective Date**"), by and between Shamrock Bank of Florida, a Florida banking corporation, having as it's address for the purposes of this Agreement as 895 Fifth Avenue South, Naples, Florida 34102 ("**Buyer**"), and **FH Partners LLC**, a Texas limited liability company ("**Seller**").

## Recitals:

**WHEREAS**, Meridian Bank, Eldred, Illinois ("Bank") made a loan to Great River Enterprises Limited Partnership #1 ("Borrower") evidenced by a note in the original principal amount of $1,300,000 dated December 6, 2007, executed by Borrower, as maker, and payable to Bank (the "Note"); and

**WHEREAS**, Bank, as lead bank, entered into a Participation Certificate and Agreement dated December 6, 2007 (the "Participation Agreement") with Shamrock Bank of Florida as a participant in the loan evidence by the Note, which transferred to Buyer was a ninety-six and 15/100 percent (96.15%) participation interest (the "Participation Interest") in the Note pursuant to that certain Participation Certificate and Agreement dated December 6, 2007 between Bank and Buyer (the "Participation Agreement"); and

**WHEREAS**, on October 10, 2008, the Bank was closed by the Illinois Department of Financial Professional Regulation – Division of Banking and the Federal Deposit Insurance Corporation (the "FDIC") was appointed as Receiver of the Bank (the "Receiver");

**WHEREAS**, Seller purchased the Note from the Federal Deposit Insurance Corporation ("FDIC"), as receiver of Bank pursuant to the terms of a Loan Sale Agreement dated February 13, 2009 (the "FDIC Loan Sale Agreement") subject to the Participation Interest held by Buyer;

**WHEREAS**, Seller wishes to sell to Buyer, and Buyer wishes to buy from Seller, all of Seller's right, title and interest in and to the Loan (as defined herein in Section 1.1) subject to the Participation Interest held by Buyer;

**WHEREAS**, Buyer has had access to the loan files regarding the Loan as a participant in the Loan, has had access to records relating to the Loan and has received pro rata payments pursuant to the terms of the Participation Agreement related to the payments made by the Borrower or on the Borrower's behalf. Buyer is relying on its knowledge of the Loan based on its participation in the Loan and its independent knowledge of the Borrower and any guarantor(s) of the Loan (together with the Borrower, the "Obligors") and Seller has not provided any materials for review by Seller, other than the original Collateral Documents held by Seller;

**NOW, THEREFORE**, in consideration of the premises and mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

EXHIBIT
D

## ARTICLE I
## SALE AND PURCHASE

1.1 **Agreement to Sell and Purchase Loan; Assumption of Obligations by Buyer; Retained Claims.** Seller agrees to sell, and Buyer agrees to purchase, all of Seller's right, title and interest in and to the loan evidenced by the Note, which includes without limitation, all right, title and interest of Seller, if any, in and to (i) the obligations evidenced by the Note and any other Indebtedness Instrument (as defined herein in Section 11.1(a)), (ii) all remedies, powers, liens or security interests of Seller in or under the Collateral Documents (as defined herein in Section 11.1(d)), and (iii) the Records (as defined herein in Section 11.1(e)), items (i) through (iii) (all such rights and interests being subject to the Participation Interest owned by Buyer) are collectively referred to and defined as the **"Loan"** (the Loan may be referred to herein sometimes as the "Loans"), subject to and pursuant to the terms and conditions set forth in this Agreement. Buyer agrees to assume all of the obligations of the payee of the Loan and the Seller under the Loan and Participation Agreement on and after the Closing Date, including, without limitation, all obligations arising under the Note and any other Indebtedness Instrument and all Collateral Documents, including without limitation, all obligations for disbursements of principal, and Buyer hereby expressly agrees to indemnify, defend and hold harmless Seller, the FDIC and Bank and their agents and employees from and against any claims, demands and causes of action arising out of claims of breach or default by Buyer of such obligations. On the Closing Date, the ownership of the Loan will be transferred to and vested in Buyer on the terms and subject to the conditions set forth in this Agreement, including without limitation, the payment by Buyer of the Purchase Price.

Buyer and Seller agree that the sale of the Loan pursuant to this Agreement will exclude the transfer to Buyer of any right, title and interest of the FDIC (both in its corporate capacity and as receiver of Bank), and Bank in and to any and all claims of any nature whatsoever that might now exist or hereafter arise, whether known or unknown, that the FDIC (in its corporate capacity or as Receiver) has or might have (a) against officers, directors, employees, insiders, accountants, attorneys, other persons employed by the FDIC or Bank and any of its predecessors, underwriters or any other similar persons who have caused a loss to the FDIC or Bank and any of its predecessors in connection with the initiation, origination or administration of the Loan, (b) against any appraisers, accountants, auditors, attorneys, investment bankers or brokers, loan brokers, deposit brokers, securities dealers or other professional individuals or entities who performed services for the FDIC or Bank or any of its predecessors, relative to the Loan, (c) against any third parties involved in any alleged fraud or other misconduct relating to the making or servicing of the Loan, or (d) against any appraiser or other party from whom the FDIC or Bank or any servicing agent contracted for services or title insurance in connection with the making, insuring or servicing of the Loan. The foregoing interests of the FDIC and the Bank were retained by the FDIC, as seller, under the terms of the FDIC Loan Sale Agreement. Seller does not claim or own any right or interest in the above-described claims or interests of the FDIC and the Bank and has not and will not exercise or attempt to exercise any such rights or assert any such claims on its own behalf.

If, prior to the Closing Date (as defined herein), Seller shall determine, in Seller's sole and absolute discretion, that Seller is unable under the law or due to a court order to sell the Loan, then Seller, in its sole and absolute discretion, may terminate this Agreement and shall have no obligation to sell the Loan to Buyer.

1.2 **"AS IS, WHERE IS" SALE. AS AN ESSENTIAL INDUCEMENT TO SELLER TO SELL THE LOAN TO BUYER ON THE TERMS AND CONDITIONS SET FORTH IN THIS**

AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS, AND AGREES AS FOLLOWS:

(A) EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE LOAN IS BEING SOLD TO BUYER IN ITS CURRENT "AS IS, WHERE IS" CONDITION, WITH ALL FAULTS AND LIMITATIONS.

(B) BUYER IS A FINANCIAL INSTITUTION, OR AN INSTITUTIONAL PURCHASER OR OTHER SOPHISTICATED ENTITY THAT IS IN THE BUSINESS OF BUYING, ORIGINATING, OR SELLING LOANS OR THAT OTHERWISE DEALS IN SUCH INSTRUMENTS IN THE ORDINARY COURSE OF BUSINESS, OR IS OTHERWISE AN ACCREDITED INVESTOR CAPABLE OF EVALUATING THE MERITS AND RISKS RELATING TO THE PURCHASE OF THE LOAN AND IS CAPABLE OF MAKING AN INFORMED PURCHASE IN CONNECTION THEREWITH. BUYER UNDERSTANDS THE SPECIAL NATURE OF THIS TRANSACTION AND THE HIGH LEVEL OF DUE DILIGENCE REQUIRED IN CONSUMMATING SUCH A TRANSACTION, AND UNDERSTANDS AND IS VOLUNTARILY TAKING ALL RISKS INVOLVED IN CONNECTION WITH THIS TRANSACTION. FINALLY, BUYER ACKNOWLEDGES AND UNDERSTANDS THAT THE LOAN MAY HAVE LIMITED OR NO LIQUIDITY AND HEREBY REPRESENTS AND WARRANTS TO SELLER THAT BUYER HAS THE FINANCIAL CAPACITY TO BEAR THE ECONOMIC RISKS OF THE PURCHASE OF THE LOAN. THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY OR A SALE OF ANY SECURITIES.

(C) PRIOR TO THIS SALE, BUYER WAS GIVEN AN OPPORTUNITY TO MAKE AN INDEPENDENT INVESTIGATION AND EXAMINATION OF THE LOAN AND ALL MATTERS RELATED THERETO (INCLUDING INFORMATION AND RECORDS MADE AVAILABLE BY SELLER AND SUCH RECORDS AS MAY BE AVAILABLE TO THE PUBLIC FROM LOCAL, COUNTY, STATE, AND FEDERAL AUTHORITIES, COURTS, AND RECORD-KEEPING OFFICES), AND TO BECOME FULLY FAMILIAR WITH THE PAYMENT STATUS THEREOF. THE BUYER HAS HAD LIMITED ACCESS TO THE LOAN FILES AND COLLATERAL DOCUMENTS RELATED TO THE LOAN AS A RESULT OF BUYERS OWNERSHIP OF THE PARTICIPATION INTEREST IN THE LOAN AND ITS INDEPENDENT KNOWLEDGE OF THE OBLIGORS WHO ARE OBLIGATED TO PAY AND PERFORM THE OBLIGATIONS TO BE PAID AND PERFORMED UNDER THE LOAN AND THE PROPERTY CURRENTLY SECURING THE LOAN. BUYER, AS A RESULT OF AND RELYING UPON ITS KNOWLEDGE OF THE LOAN, THE OBLIGORS AND ANY COLLATERAL FOR THE LOAN AS A PARTICPANT IN THE LOAN AND HAVING HAD ACCESS TO THE COLLATERAL DOCUMENTS RELATED TO THE LOAN AS A PARTICIPANT IN THE LOAN DESIRES TO PURCHASE THE LOAN BASED UPON SUCH KNOWLEDGE; BUYER HAS NOT BEEN PROVIDED ANY MATERIALS FOR REVIEW BY SELLER.

(D) EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NO SELLER RELATED PARTY HAS MADE TO BUYER ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES, OR STATEMENTS, WHETHER EXPRESS OR IMPLIED, OF ANY TYPE, KIND, CHARACTER OR NATURE WHATSOEVER, WITH RESPECT TO THE LOAN, INCLUDING, WITHOUT LIMITATION, (1) THE PAYMENT HISTORY OF THE LOAN OR THE PHYSICAL CONDITION OR OPERATION OF ANY COLLATERAL, INCLUDING, WITHOUT LIMITATION, THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS THEREON (INCLUDING, WITHOUT LIMITATION, THE PRESENCE OF POLYCHLORINATED BIPHENYLS (PCB's), RADON GAS, LEAD PAINT, ASBESTOS OR ASBESTOS-CONTAINING MATERIALS OR THE RELEASE OR

THREATENED RELEASE OF HAZARDOUS SUBSTANCES), (2) THE ECONOMIC VALUE OF THE LOAN OR THE REVENUES OR EXPENSES OF ANY COLLATERAL, (3) THE COLLECTIBILITY OF ANY LOAN, (4) THE CREDITWORTHINESS OF ANY OBLIGOR OF A LOAN, (5) THE FREEDOM OF ANY COLLATERAL OF A LOAN FROM LIENS AND ENCUMBRANCES IN WHOLE OR IN PART, (6) THE PRIORITY OR EXISTENCE OF ANY LIEN SECURING PAYMENT OF ANY LOAN, (7) THE TRANSFERABILITY AND ENFORCEABILITY OF DOCUMENTS SECURING OR SUPPORTING ANY LOAN, (8) THE NATURE AND EXTENT OF ANY MATTER AFFECTING TITLE TO ANY COLLATERAL, OR (9) ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY OF "FITNESS FOR A PARTICULAR PURPOSE", "MERCHANTABILITY" OR ANY OTHER KIND WHICH WOULD OTHERWISE ARISE BY STATUTE OR UNDER COMMON LAW. NOTHING CONTAINED IN THIS AGREEMENT OR IN ANY OTHER INFORMATION OR RECORDS PROVIDED TO BUYER IN CONNECTION WITH THE LOAN SHALL BE CONSTRUED AS ASSURING THE COLLECTION OF ALL OR ANY PORTION OF THE LOAN OR THE EXISTENCE OF COLLATERAL OR OTHER SECURITY FOR THE LOAN. THE DESCRIPTION OF THE NOTE, ANY MORTGAGE OR DEED OF TRUST OR ANY OTHER DOCUMENTS SECURING THE NOTE SHALL NOT CONSTITUTE A REPRESENTATION OR WARRANTY CONCERNING THE VALIDITY, ENFORCEABILITY, EXISTENCE OR ANY OTHER CIRCUMSTANCE RELATING TO THE NOTE OR DOCUMENTS SECURING THE NOTE, IF ANY.

   1.3   **Sale Without Recourse.** Seller makes no warranty or guarantee as to any payments by any Obligor under the Loan, and Seller and Buyer hereby agree that, except as expressly set forth in this Agreement, the sale of the Loan from Seller to Buyer is without recourse and that Buyer shall not be entitled to receive from Seller any sum of money or thing of value (whether tangible or intangible), or to set off, counterclaim, deduct, or withhold or have withheld from Seller any sum of money or thing of value (whether tangible or intangible), upon any default by any Obligor in the payment of the Loan or upon any other default by any Obligor under any Loan Document.

## ARTICLE II
## PURCHASE PRICE; PAYMENT OF PURCHASE PRICE

   2.1.   **Purchase Price.** Subject to the terms and conditions set forth in this Agreement, Buyer agrees to pay, and Seller agrees to accept, as consideration for the conveyance of the Loan to Buyer, the amount of $45,000.00 (the "**Purchase Price**") on the date (the "**Closing Date**") upon which the transactions contemplated by this Agreement related to the Loan are consummated, which date shall in no event be later than November 6, 2009, unless the parties otherwise mutually agree in writing.

   2.2   **Payment.** The Purchase Price shall be paid to Seller on or before the Closing Date in U.S. funds by wire transfer in collected funds to the Seller's account as follows:

   Bank of America, N.A., Hartford, CT
   ABA # 026009593
   For Credit to: FH Partners, L.LC.
   Acct. # 385002859990
   ref: Great River Enterprises Loan Purchase - Geib

   2.3   **Obligor Payments.** All payments by any Obligor of principal or interest received on or before the Effective Date attributable to the undivided interest of the Seller in the principal or interest payments under the Loan pursuant to the Participation Agreement, including prepayments

Seller shall be discharged and released from any obligation, liability, or responsibility with respect to the servicing and administration of the Loan as of and after the Closing Date. Buyer shall abide by and be subject to all of the terms and conditions of the Note and all Collateral Documents and other instruments and documents governing or relating to the Loan and/or the servicing rights and other rights thereunder. Buyer hereby acknowledges that the Loan may include provisions for negative amortization and/or balloon payments of principal, and that the servicing of the Loan may be affected accordingly.

(b)     After the Closing Date, Buyer shall be solely responsible for compliance with any laws, rules, or regulations governing the ownership, servicing, and/or administration of the Loan, including, without limitation, the obligation to notify any Obligor or any guarantor or surety of the transfer of servicing rights from Seller to Buyer. Further, Seller shall have the right, but not the obligation, to mail a notice addressed to any Obligor and/or any guarantor or surety, at the address shown in its records, notifying such Obligor, guarantor or surety of the transfer of the Loan or the servicing of the Loan from Seller to Buyer.

## ARTICLE VI
## RISK OF LOSS

Buyer hereby acknowledges and agrees that from and after the Effective Date, all risk of loss in connection with the Loan shall be borne by Buyer, including, without limitation, any casualty or condemnation involving any Collateral for the Loan, and no loss in connection with the Loan will give Buyer the right to terminate this Agreement or otherwise to seek full or partial relief from Buyer's obligations under this Agreement to purchase the Loan without reduction or abatement in the Purchase Price; *provided, however,* that, upon closing, any casualty insurance or condemnation proceeds payable to Seller, which have not been applied against amounts owed on the Loan, shall be assigned by Seller to Buyer and forwarded to Buyer immediately upon receipt thereof by Seller.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF SELLER

7.1     **Representations and Warranties.**  Seller hereby represents and warrants to Buyer as follows, which representations and warranties are made as of the date of this Agreement and as of the Closing Date:

(a)     **Organization; Limited Liability Company.**  Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas;

(b)     **Authorization.**  The Seller has full power and authority to sell, assign and transfer the Loan and has full power and authority to execute, deliver and perform its obligations under this Agreement, the Assignment and Assumption referred to in Article XI (the "**Assignments**"), any Deeds of Trust and Mortgages, if any, and the Allonges (the "**Allonges**") referred to in Article XI (this Agreement, the Assignments, the Allonges, and any other documents executed by Seller in connection with this transaction are sometimes herein collectively referred to as the "**Documents**");

(c)     **Documents.**  The Documents have been duly authorized, executed and delivered by the Seller, constitute valid and legal binding obligations of the Seller, and are enforceable against the Seller in accordance with their terms, except as enforcement might be

limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of rights generally and by general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law);

(d)    **Conflicts.** The execution and delivery of the Documents by the Seller and the performance by the Seller of its obligations thereunder do not and will not conflict with or constitute a breach of or result in a violation of **(i)** the organizational documents of Seller; or **(ii)** any agreement or other instruments to which the Seller is a party;

(e)    **Ownership.** Seller is the owner of the Loan as of the Effective Date subject to the Participation Interest owned by Buyer and has not transferred or otherwise assigned any interest it has had at any time in the Loan to any person or entity;

(f)    **Encumbrance.** Seller has not encumbered or sold the Loan except as set forth in this Agreement and for a grant of a security interest in the Loan by Seller to its lender, Bank of Scotland; the sale will be free and clear of the security interest granted to Bank of Scotland effective as of the Closing Date;

(g)    **Loan Documents.** Seller has caused to be delivered to the Buyer the original Note, Mortgage, Guaranties, and other Collateral Documents for the Loan that were delivered to Seller by the FDIC. Buyer acknowledges that Seller owns another loan of Borrower payable to Bank and the Seller is not obligated to deliver any documents or information related to that loan which is being retained by Seller. Seller has not agreed with any Obligors to modify, amend, extend, or change the Collateral Documents in any manner whatsoever; and

(h)    **Loan Payments.** Seller has not received any payment from any Obligor under the Loan since a payment of interest in the amount of $7,478.02 was received by on July 2009.

7.2    **Survival of Representations and Warranties.** Seller's representations and warranties set forth in Section 7.1 shall survive Closing, but shall terminate upon the earlier to occur of **(i)** Buyer obtaining full payment of the Loan or otherwise accepting partial payment in full satisfaction thereof; **(ii)** Buyer releasing an Obligor or any other guarantors, sureties, or other persons liable for payment of a Loan, **(iii)** Buyer's amendment, modification, extension, rearrangement or release in any manner of the Loan; **(iv)** Buyer's sale, transfer or assignment of the Loan or any portion thereof, or **(v)** six (6) months after the Closing Date.

7.3    **Remedy for Breach of Representations and Warranties.** Unless otherwise mutually agreed, Buyer's remedy for breach of Seller's representations and warranties as to the Loan (and which was not waived by Buyer) which Seller is unable or unwilling to cure or correct within a reasonable time shall be to require Seller to repurchase the Loan for an amount (the "**Repurchase Price**") equal to the Purchase Price paid for the Loan less an amount equal to the sum of payments made from Closing Date to date of repurchase applicable to the three and 85/100 percent (3.85%) undivided interest in the principal and interest payments under the Loan retained by the Bank under the Participation Agreement which would have been payable to Seller. Buyer acknowledges that the Loan is sold subject to the Participation Interest owned by Buyer in the Loan prior to the Closing Date and that Buyer shall not be entitled to recover any remedy or damages related to the Participation Interest owned by Buyer in connection with any breach of Seller's representations and warranties as to the Loan. Any payments on the Loan which would have been distributed to Seller as its three and 85/100 percent (3.85%) undivided interest in the principal and

interest payments under the Loan, which are received by Buyer after Seller's repurchase of such Loan, shall belong to Seller, and Buyer agrees to remit all such payments to Seller within a reasonable time after receipt. Buyer shall execute all endorsements and assignments necessary to transfer the repurchased Loan and liens securing the Loan to Seller and will deliver to Seller all documents which were delivered to Buyer by Seller at closing of the purchase of the Loan by Buyer, all of which interests shall be subject to the Participation Interest of Buyer therein according to the terms of the Participation Agreement (as such rights, duties and interests of the parties existed under the Participation Agreement immediately prior to the Closing Date), which Participation Interest shall be acknowledged to be in full force and effect. Seller has no obligation to repurchase the Loan if the Loan and the liability of any person thereon has been amended, modified, extended, rearranged or released in any manner.

7.4   **Release.**   Seller hereby releases and forever discharges Buyer and all of Buyer's officers, directors, shareholders, employees, agents, attorneys, contractors and representatives, and their successors, assignees and affiliates, from any and all claims (including any counterclaim or defensive claim), demands, causes of action, judgments or legal proceedings and remedies of whatever kind or nature that Seller now has or might have in the future, whether now known or unknown, which are related in any manner whatsoever to the Loan, the Participation Agreement or this Agreement; provided, however, that this release does not include a release of any action or claim of Seller resulting from Buyer's failure to perform under the terms of this Agreement, or any claims which may arise subsequent to any repurchase by Seller pursuant to Section 7.3 hereof.

## ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES AND COVENANTS OF BUYER

8.1   **Representation and Warranties.**   Buyer hereby represents and warrants to Seller as follows, which representations and warranties are made as of the date of this Agreement and as of the Closing Date:

(a)   **Decision to Purchase.**   Buyer has independent knowledge concerning the Loan, any properties securing the Loan and the Obligors of the Loan based upon its ownership of the Participation Interest, and its own independent investigation of, the Obligors and guarantors. Buyer has made Buyer's bid and decision to buy the Loan based upon Buyer's own independent knowledge and evaluation of the Loan and has not relied upon any oral or written information provided by any employee or representative of Seller. Buyer has not relied on any statements or representations of Seller other than those specifically contained in this Agreement. Further, the Buyer represents and warrants that Buyer is purchasing for Buyer's own account, is not purchasing with a view to public distribution and is not in a disparate bargaining position relative to the Seller with respect to this Agreement. The Buyer acknowledges that the Seller does not represent, warrant or insure the accuracy or completeness of any information it has reviewed in conducting its due diligence related to the Loan or the sources of information upon which Buyer relied in conducting its due diligence related to the Loan. The Buyer agrees and represents that the materials previously provided to it as an owner of the Participation Interest by Bank and the FDIC were an adequate and sufficient basis on which to determine whether to purchase the Loan. The Buyer has made such independent investigations as Buyer deems to be warranted into the nature, validity, enforceability, collectability, and value of the Loan, and all other facts Buyer deems material to Buyer's purchase and is entering into this transaction solely on the basis of that investigation and the Buyer's own judgment, and is not acting in reliance on any representation made or information furnished by the Seller, its employees, agents, representatives or independent contractors (other than the representations and warranties of the Seller contained in Article VII herein).

(b)   **Authority and Existence**.  Buyer, if an entity, is a legal entity, validly existing and in good standing under the laws of the state of its formation.  Buyer is duly and legally authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions, articles, bylaws or agreements to which it may be subject.   The undersigned representative(s) of Buyer is/are duly authorized to act on behalf of and to bind Buyer to the terms of this Agreement.  At the closing, Buyer will deliver to Seller documents authorizing Buyer's entry into this Agreement, together with such other documents as Seller may reasonably require in evidence of Buyer's good standing or authority, including, if Buyer, its Partner, Manager or General Partner is a corporation or association, a verified copy of a resolution of its Board of Directors.

(c)   **Enforceability**.  This Agreement, when duly executed and delivered, and all of Buyer's obligations hereunder will be the legal, valid and binding obligations of Buyer, enforceable in accordance with the terms of this Agreement, except as enforcement might be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(d)   **Performance**.  Buyer's performance of Buyer's duties and obligations of Buyer under this Agreement will not conflict with, result in a breach of or default under, or be adversely affected by, any agreements, instruments, decrees, judgments, injunctions, orders, writs, laws, rules or regulations, or any determination or award of any arbitrator, to which Buyer is a party or by which Buyer or Buyer's assets are bound.

(e)   **Identity**.   Buyer is a "United States person" within the meaning of Paragraph 7701(a)(30) of the Internal Revenue Code of 1986, as amended.  Buyer is not a person or entity with which Seller is prohibited from doing business under any rule or regulation of the Department of the Treasury's Office of Foreign Assets Control including, but not limited to the Global Terrorism Sanctions Regulations.

8.2   **Covenants**.  Buyer hereby covenants and agrees with Seller as follows, which covenants and agreements are made as of the date of this Agreement and as of the Closing Date and shall survive Closing:

(a)   **Covenant of Buyer**.  The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of the Buyer shall create any inference that the transactions involve any "security" or "securities".  The Buyer acknowledges, understands and agrees that the acquisition of loans such as the Loan involve a high degree of risk and are suitable only for persons or entities of substantial financial means who have no need for liquidity and who can hold the Loan indefinitely or bear the partial or entire loss of the value of the Loan.

(b)   **Waiver**.  The Buyer represents and warrants to the Seller that it has knowledge and experience in financial and business matters that enable the Buyer to evaluate the merits and risks of the transactions contemplated hereby.  Further, the Buyer represents and warrants to the Seller it is not in a disparate bargaining position relative to the Seller.  The Buyer hereby waives, to the maximum extent permitted by law, any and all rights, benefits and remedies under the Texas Deceptive Trade Practices Act or any other remedial statute granting Buyer any rights, benefits, or remedies with respect to any matters pertaining  to this Agreement and the

transactions contemplated hereby greater than the rights and remedies provided herein. Buyer waives any right to claim punitive damages for any actions, breaches or conduct of Buyer relating to the sale of the Loan.

(c) **Use of the FDIC's Name and Reservation of Statutory Powers.** Buyer acknowledges and agrees that the assignment of the Loan or any Collateral Document pursuant to the terms of this Agreement shall not constitute the assignment of any other rights, powers or privileges granted to the FDIC pursuant to the provisions the Federal Deposit Insurance Act, including, without limitation, those granted pursuant to 12 U.S.C. § 1821(d), 12 U.S.C. § 1823(e) and 12 U.S.C. § 1825, all such rights and powers being expressly reserved by the FDIC; nor, shall Buyer assert or attempt to assert any such right, power or privilege in any pending or future litigation involving the Loan. Buyer agrees that in the event that the FDIC asserts a claim against Seller related to any breach of the provisions of this section by Buyer, that such breach will result in actual and substantial damages to Seller and/or the FDIC in an amount that cannot be determined with precision and, in the event of such breach, Buyer shall pay the lesser of (a) the sum of $25,000.00 to Seller for each such breach as liquidated damages, or (b) any lesser amount agreed to by the FDIC and Seller which is paid by Seller and accepted by the FDIC as full satisfaction of any FDIC any damages incurred by the FDIC related to any breach of the provisions of this section by Buyer, in each case, together with such fees and expenses as Seller may incur in preventing further or continuing breach of said provision and recovering such damages. Notwithstanding the provisions of this section, the FDIC may also pursue directly against Buyer any equitable remedy the FDIC may have for Buyer's breach of this covenant.

(d) **Notification of Obligors.** Buyer shall, promptly after the Closing Date, notify each Obligor of Buyer's purchase of the Loan and direct that all payments on and communications regarding the Loan be sent to Buyer after the Closing Date.

(e) **Informational Tax Reporting.** Buyer agrees to assume, as of the Closing Date, all obligations with respect to federal and state income tax informational reporting for the period after the Closing Date related to the Loan purchased under this Agreement, including obligations with respect to Forms 1099 and 1098 and back-up withholding. Buyer further agrees to cooperate with Seller to the extent necessary to allow Seller to fulfill its obligations it may have with respect to such informational reporting for such Loan for the period prior to the Closing Date.

(f) **Collection Practices.** Buyer agrees not to violate any law relating to unfair collection practices in connection with any of the Loan purchased by Buyer hereunder. Buyer further agrees to indemnify Seller and hold Seller harmless from and against any and all claims, demands, losses, damages, penalties, fines, forfeitures, judgments, legal fees and other costs, fees and expenses at any time incurred by Seller as a result of (i) Buyer's breach of the aforesaid agreement or (ii) any acts or omissions of Buyer resulting in any claim, demand or assertion that Seller, subsequent to the Closing Date, was in any way involved in or had in any way authorized any unlawful collection practices in connection with any of the Loan. Each party agrees to notify the other within ten (10) days of receiving notice or knowledge of any such claim, demand or assertion. Buyer agrees to maintain and preserve all documents and/or copies of documents provided to Buyer evidencing and/or regarding the Loan for the longer of ten (10) years from the Closing Date or such period as may be required by applicable law.

(g) **Servicing.** From and after the Closing Date, Buyer shall assume all of Seller's obligations and duties with respect to servicing the Loan purchased hereunder and shall service such Loan in accordance with commercially reasonable standards. Buyer's obligation to

service the Loan shall terminate upon the repurchase of the Loan by Seller pursuant to Article VII and delivery of the Loan and the credit files related to the Loan to Seller. Buyer and Seller agree that the terms of this Agreement shall not determine the relative rights of the parties to administer the Loan in the event of a repurchase of the Loan by Seller under Section 7.3, it being the intent of the Seller and Buyer that the rights of the Seller and Buyer to administer the Loan will be subject to determination based upon the terms of the Participation Agreement and the status and actions of the parties prior to the Closing Date. Buyer hereby agrees to and shall require any subsequent assignee of and after Buyer to allow the Seller and Seller's predecessor access to all documents and/or copies of documents provided to Buyer evidencing and/or regarding the Loan and agrees to and shall require any subsequent assignee of and after Buyer to maintain and preserve all such documents and/or copies of documents for the longer of five (5) years from the Closing Date or such period as may be required by applicable state and federal law, rules and regulations regarding the handling and maintenance of documents and records relating to the Loans. Before destruction or disposition of any documents or files transferred hereunder, Buyer agrees and Buyer shall require any subsequent assignee to agree to give reasonable notice to Seller and to allow Seller, at its own expense, to recover the same from Buyer; *provided, however,* that this provision shall terminate as to an original note evidencing the Loan when the Loan is paid in full or otherwise paid to the satisfaction of Buyer and Buyer returns the original note to the Obligor marked "Paid-in-Full".

(h)     **Compliance with Terms.**  Buyer agrees to abide by and be bound by all of the terms and conditions of the Notes and other agreements related to the Loan purchased hereunder; provided however, that Buyer may, in its sole discretion, modify, extend, renew or otherwise amend the Loan, any Indebtedness Instrument or any Collateral Document after the Closing Date subject to the applicable provisions of this Agreement, including, without limitation, Section 7.2, Article VIII(s)(ii) and any other provision of this Agreement pursuant to which the rights, duties or obligations of the Seller are affected by the modification, extension, renewal or other amendment of the Loan, any Indebtedness Instrument or any Collateral Document. The foregoing acknowledgement of the right of the Buyer to modify, extend, renew or otherwise amend the Loan, any Indebtedness Instrument or any Collateral Document shall not be deemed to be a consent to such action by Seller or a waiver by Seller of its rights under any provision of this Agreement relating to any modification, extension, renewal or other amendment of the Loan, any Indebtedness Instrument or any Collateral Document by the Buyer.

(i)     **Environmental Indemnity.**  The Buyer agrees to indemnify, defend, save and hold harmless the Seller from and against any and all loss, liability, expense or damage of any kind or nature and from any suits, causes of action, claims or demands, including reasonable attorneys= fees and costs associated therewith, arising directly or indirectly, in whole or in part, out of (i) the existence or alleged existence of any Hazardous Materials (as defined herein), on, in, or under any real property, or in any of the improvements that serve as collateral for the Loan to be purchased pursuant to this Agreement, and (ii) the removal or failure to remove any Hazardous Materials from such real property, or any activity carried on or undertaken on or off such real property by the former institution or any predecessor in title or any employees, agents, contractors or subcontractors thereof, or any persons occupying or present on such real property or by the Seller. For purposes of this Agreement, "Hazardous Materials" shall include but shall not be limited to any of the following: (a) asbestos; (b) urea formaldehyde foam insulation; (c) transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million; or (d) any other chemical, material, substance or other matter of any kind whatsoever which is prohibited, limited or regulated by any federal, state, county, regional or local authority or legislation, including, without limitation, the Federal Resource Conservation and Recovery Act, 42 U.S.C. Sections

6901 et seq. and the Federal Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, 42 U.S.C. Sections 9601 et seq., the regulations promulgated from time to time thereunder, environmental laws administered by the Environmental Protection Agency and laws and regulations of any state in which such real property is situated, or any other governmental organization or agency having jurisdiction.

        **(j)**    **Litigation.**  Buyer agrees that it will not institute any legal action in the name of Seller or continue to prosecute or defend in the name of Seller any pending legal action; nor shall Buyer intentionally or unintentionally, through misrepresentation or non-disclosure, mislead any person as to, or conceal from any person, the identity of Buyer. Nothing herein shall be deemed to preclude Buyer from disclosing to potential transferees of the Loan the fact that the Loan was acquired from Seller.

If the Loan is, as of the Closing Date, the subject of litigation, bankruptcy or foreclosure involving Seller or any Collateral, Buyer agrees that it shall, to the extent applicable, at its own cost, within fifteen (15) days after the Closing Date: **(i)** notify the Clerk of Court, any bankruptcy trustee and all counsel of record in each such proceeding of the transfer of the Loan from Seller to Buyer, **(ii)** file pleadings, at its sole cost and expense, to relieve Seller's counsel of record from responsibility in such litigation for protecting Buyer's interests, (unless Buyer independently retains Seller's counsel of record) and **(iii)** intervene or substitute Buyer as the real party-in-interest with regard to claims upon the Note and/or Collateral, and change the caption thereof accordingly. If Buyer fails to comply with the above requirements (i) through (iii), Seller may, but is not obligated to, take such actions as it deems necessary to effectuate the provisions of this paragraph. Buyer acknowledges that its failure to comply with the provisions of this paragraph may affect Buyer's rights in any such litigation or proceeding including, without limitation, the running of any statue of limitations.

        **(k)**    **Excluded Documents.** "Excluded Documents" means with respect to the Loan, any correspondence, documents, records, reports, information, internal analysis, internal memoranda, credit information, regulatory reports and/or internal assessments of valuation of the Loan or any collateral for the Loan, which may be missing or excluded from the Collateral Documents or the Records, provided that Seller shall deliver to Buyer all Collateral Documents delivered to Seller by the FDIC. Buyer understands that Excluded Documents (as defined in this paragraph) may be missing or may have been removed from the files related to the Loan delivered to Buyer by Seller (the "**Loan Files**"). The Excluded Documents may include material information which, if made known to Buyer, could have had a material, direct or indirect impact upon perceived, apparent or actual value of the Loan. Buyer agrees, acknowledges, confirms and understands that the Excluded Documents might directly or indirectly relate to or impact upon the perceived, apparent or actual **(i)** value, **(ii)** merits, **(iii)** risks, and/or **(iv)** hazards inherent with respect to the Loan. The risk that such Excluded Documents might be pertinent in order to make an informed decision with respect to the perceived, apparent or actual **(w)** value, **(x)** merits, **(y)** risks and/or **(z)** hazards associated with or in connection with the Loan is accepted by Buyer as a risk of entering into this Agreement. The risk that the Excluded Documents might be pertinent to Buyer in order for Buyer to make an informed decision with respect to the actual, apparent or perceived value of the Loan shall be borne by Buyer. It is the express intention and understanding between Seller and Buyer that the Excluded Documents are not included in the Collateral Documents or the Records and are not to be sold, transferred, assigned or conveyed by Seller to Buyer, and Buyer shall at no time ask for, seek or be provided access to any or all of such Excluded Documents. Excluded Documents may further include Seller's own evaluations of the Loan and/or Collateral, attorney-client privileged materials or Seller's internal action plans for the

Loan.

(l)   **Non-disclosure.**  Buyer is in full compliance with its obligations under the terms of any confidentiality agreement executed by Buyer to review the information made available by Seller regarding the Loan, and the terms thereof are hereby incorporated herein subject to Buyer's ownership rights and interests acquired by Buyer hereunder.

(m)   **Assistance of Third Parties.**  Buyer hereby agrees, acknowledges, confirms and understands that Seller shall have no responsibility or liability to Buyer arising out of or related to any third parties' failure to assist or cooperate with Buyer.  The risks attendant to the potential failure or refusal of third parties to assist or cooperate with Buyer and/or Seller in the effective transfer, assignment, and conveyance of the purchased Loan and/or assigned rights shall be borne by Buyer.

(n)   **Release.**

(i)   Buyer hereby releases and forever discharges Seller, the FDIC and Bank, all of their officers, directors, employees, agents, attorneys, contractors and representatives, and their successors, assignees and affiliates, from any and all claims (including any counterclaim or defensive claim), demands, causes of action, judgments or legal proceedings and remedies of whatever kind or nature that Buyer now has or might have in the future, whether now known or unknown, which are related in any manner whatsoever to the Loan and this Agreement; provided, however, that this release does not include a release of any action or claim of Buyer resulting from Seller's failure to perform under the terms of this Agreement, including without limitation, any claims, rights or remedies provided to Buyer under Section 7.3 hereof or any claims which may arise subsequent to any repurchase of a Loan by Seller pursuant to Section 7.3 hereof.  In addition, Buyer hereby releases and forever discharges Seller and Seller's officers, directors, employees, agents, attorneys, contractors and representatives, and their successors, assignees and affiliates, from any and all claims (including any counterclaim or defensive claim), demands, causes of action, judgments or legal proceedings and remedies of whatever kind or nature that Buyer now has or might have in the future, whether now known or unknown, which are related in any manner whatsoever to the Participation Agreement; provided, however, that this release does not include a release of any action or claim of Buyer resulting from Seller's failure to perform under the terms of this Agreement, including without limitation, any claims, rights or remedies provided to Buyer under Section 7.3 hereof or any claims which may arise subsequent to any repurchase of a Loan by Seller pursuant to Section 7.3 hereof.  Buyer is not releasing the FDIC or Bank related to any claims of Buyer against the FDIC or Bank related to the sale of the participation interest by Bank to Buyer pursuant to the Participation Agreement or any other actions or omissions of Bank related to the Participation Agreement.

(ii)   Buyer agrees that it will not, and Buyer agrees it will require subsequent assignees not to, renew, extend, renegotiate, compromise, settle or release the Note, any Indebtedness Instrument or Loan or any right of Buyer founded upon or growing out of this Agreement, except upon payment in full thereof, unless all Obligors on said Note or Loan shall first release and discharge Seller, Bank and FDIC and their agents and assigns (the "Released Parties") from all claims, demands and causes of action which any such Borrower may have against any such Released Party arising from or growing out of any act or omission occurring prior to the date of such release.  If Buyer fails to obtain such release, Buyer agrees to protect, save and hold Seller, Bank and the FDIC harmless from any expense or damage Seller, Bank and/or the FDIC suffers that might have been prevented had Buyer obtained the release.

8.3    Survival of Representations, Warranties and Covenants .    Buyer's representations, warranties, covenants and agreements set forth herein shall survive the closing hereof for the applicable period of limitations.

## ARTICLE IX
## ENVIRONMENTAL AND OTHER COLLATERAL ASSESSMENTS

9.1    **Environmental Risks.**  Buyer expressly understands, acknowledges and agrees that there may be certain environmental issues and/or risks with respect to the Collateral (which may or may not be visible or apparent and which may or may not be above or below the surface thereof). A copy of a written report may or may not have been included in the Records evidencing the results of an environmental assessment performed on Seller's behalf or on behalf of an owner of the Collateral for the purpose of assessing the environmental issues concerning the Collateral (the "**Environmental Assessment Report**").    Buyer understands and acknowledges that any Environmental Assessment Report which may be in the Records or is otherwise provided or made available by Seller or its employees, agents, contractors or representatives, is being provided expressly without representations or warranties as to the qualifications or expertise of the author thereof or the completeness or accuracy of the facts, presumptions and conclusions contained therein, and Buyer shall not rely on same to Buyer's detriment in evaluating or closing the transaction contemplated hereby.  Buyer has been expressly advised by Seller to conduct, to the extent permitted by the applicable Collateral Documents, an independent investigation and inspection of the Collateral, utilizing such experts as Buyer deems to be necessary, proper or appropriate, and to make an independent assessment of all liability and risk with respect to the Collateral.

9.2    **Appraisals.**  Buyer understands and acknowledges that: (a) any  Appraisal which may be in the Records or is otherwise provided or made available by Seller or its employees, agents, contractors or representatives, is being provided expressly without representations or warranties as to the qualifications or expertise of the author thereof or the completeness or accuracy of the facts, presumptions and conclusions contained therein, and Buyer shall not rely on same to Buyer's detriment in evaluating or closing the transaction contemplated hereby, and (b) any Appraisal which may not have been provided by Seller or its employees, agents, contractors and representatives may, if the same had been provided to Buyer, have had a direct impact upon the actual and/or Buyer's perceived valuation, risk or assessment thereof and/or hazards associated with or related to the Collateral.

9.3    This paragraph left intentionally blank.

9.4    **Buyer's Waiver of Cause of Action.**  Subject to the other terms of this Agreement, Buyer hereby waives any right or cause of action it might now or in the future have against the FDIC, Bank or Seller as a result of its purchase of the Loan subject to this Agreement; provided, however, that this waiver does not include a release of any action or claim of Buyer resulting from Seller's failure to perform under the terms of this Agreement.

9.5    **Intervening or Missing Assignments.**  Buyer acknowledges and agrees that Seller shall have no obligation to secure or obtain any missing intervening assignment or any assignment to Seller that is not contained in the Loan File or among the Collateral Documents. Buyer shall have the sole responsibility and expense of securing any intervening assignment or

any assignment to Seller that may be missing from the Collateral Documents from the appropriate source.

## ARTICLE X
## INDEMNIFICATION

From and after the date of this Agreement, Buyer shall indemnify and hold harmless Seller against and from any and all liability for, and against and from any and all losses or damages Seller may suffer as a result of, any claim, demand, cost, expense, or judgment of any type, kind, character or nature (including attorneys' fees and court costs), which Seller shall incur or suffer as a result of (a) any act or omission of Buyer or Buyer's agents in connection with the Loan and its purchase of the Loan pursuant to this Agreement, (b) the material inaccuracy of any of Buyer's representations or warranties herein, (c) the breach of any of Buyer's covenants herein, (d) any claim by any Obligor, guarantor or surety regarding the assignment or enforcement subsequent to the Closing Date of the Loan by Buyer, and/or (e) any acts or omissions of Buyer resulting in any claim, demand or assertion that Buyer, subsequent to the Closing Date, was in any way involved in or had in any way authorized any unlawful collection or accounting practices in connection with the Loan. Each party agrees to notify the other within ten business (10) days of receiving notice or knowledge of any such claim, demand or assertion. Seller represents that it has no knowledge as of the date of this Agreement of any claim, or threatened claim, which could require Buyer to indemnify Seller under the terms of this Agreement other than matters specifically addressed in this Agreement.

## ARTICLE XI
## CLOSING

**11.1   Seller's Deliveries.**  At closing, subject to the payment by Buyer of the Purchase Price (plus any other sums that Buyer has agreed hereunder to pay Seller at the closing, less any credits to which Buyer may be entitled hereunder, if any), and delivery of the prepared Closing Documents to Seller by Buyer, Seller shall deliver the following to Buyer, all of which shall be duly executed and acknowledged as applicable:

(a)   each original promissory note or other evidence of indebtedness for the Loan (an "Indebtedness Instrument"), endorsed by Allonge in the form of **Exhibit A** in blank;

(b)   an original counterpart of the Assignment and Assumption in the form of **Exhibit B** for the Loan suitable for recordation in the office for recording of deeds in the County where any relevant Real Property Collateral is located;

(c)   a notice to each Obligor informing the Obligor of the closing and directing it to forward all future payments directly to Buyer, which notice shall be substantially in the form attached as **Exhibit C** (the "Notice").  The Notice will be mailed to Obligors by the Buyer within five (5) Business Days of the Closing Date via certified mail return receipt requested;

(d)   originals or, if unavailable, copies of any mortgage, deed of trust, assignment of rents, security agreement, guaranty, or other instrument or document securing payment or performance of the Loan in the Seller's possession or control, including any supplements, amendments, or modifications thereto or renewals or extensions thereof in the Seller's possession or control (the "Collateral Documents");

(e)   originals or copies of the Records.  "Records" are defined as all records,

correspondence, Collateral Documents and other files that have been received or generated and maintained in the course of owning and/or administering the Loan, *provided* that the same are in the possession or control of Seller; *provided, however,* that the Records may not include Excluded Documents and will not include any documents in the possession of the Seller which relate to a loan of the borrower payable to Bank which is being retained by the Seller;

(f)       corporate and other documents reasonably necessary to evidence authority, and incumbency; and

(g)       copies of executed assignments and a redacted copy of the FDIC Loan Sale Agreement (which Buyer acknowledges that it has received) reflecting the transfer of ownership of the Loan from Bank or the FDIC to Seller.

Buyer hereby agrees that Seller shall have the absolute and unrestricted right to make and retain copies of any materials sold, transferred, conveyed, assigned, or delivered to Buyer in connection with this Agreement, including, without limitation, the Records.

After the transfer of documents or files to the Buyer pursuant to the terms in this Agreement, Buyer agrees that Seller shall have the continuing rights to use, inspect, and make extracts from or copies of any such documents or records, upon Seller's reasonable notice to Buyer. Buyer further agrees to allow the FDIC the temporary possession, custody and use of original documents for any lawful purpose and upon reasonable terms and conditions; provided that the FDIC has requested Seller to provide the FDIC with access to such documents.

Buyer shall be responsible for the preparation, actual filing, expense, and recording of all Closing Documents (as defined herein) delivered by Seller under this Section 11.1, 11.2 and Section 11.3 and all related forms.

**11.2   Buyer's Deliveries.**   On or before the Closing Date, Buyer shall deliver the following to Seller, all of which shall be duly executed and acknowledged as applicable:

(a)       a original counterpart of the Assignment and Assumption for the Loan set forth in **Exhibit B**; and

(b)       the corporate and/or partnership and/or other documents, instruments, and certificates that may be required by Seller in connection herewith.

**11.3   Additional Deliveries.**   Seller and Buyer agree, for a period of six months after the Closing Date, to execute, acknowledge where appropriate, and deliver or cause to be executed, acknowledged where appropriate, and delivered such further instruments and documents and to take such other actions as the other of them may reasonably request to carry out the intents and purposes of this Agreement. The term **"Closing Documents"** shall mean all documents described in Sections 11.1, 11.2 and 11.3 hereof.

**11.4   Insurance.**   Buyer is responsible for having itself substituted as loss payee on any collateral risk insurance in which Seller is currently listed as a loss payee. Any loss after the Closing Date to either any Obligor or the Buyer or to the value or collectability of the Loan due to Seller's cancellation of collateral risk insurance or its failure to identify Buyer as loss payee is the sole responsibility of Buyer.

## ARTICLE XII
## NOTICE OF OBLIGOR CLAIMS OR LITIGATION

Buyer shall promptly notify Seller of any claim, threatened claim, or litigation filed by any Obligor or any guarantor or surety against Seller which arises from or relates to the Loan purchased hereunder upon actual receipt of knowledge of any such claim.

## ARTICLE XIII
## MISCELLANEOUS

13.1   **Expenses.**  All legal and accounting fees associated with the negotiations related to, preparation and closing of this Agreement shall be paid by the party incurring same.

13.2   **Notices.**  Any communication, notice or demand of any kind whatsoever that either party may be required or may desire to give to or serve upon the other shall be in writing, addressed to the parties at the addresses set forth below, and delivered by personal service, by reputable overnight delivery service, or by facsimile transmission:

If to Seller:          FH Partners LLC
                       P.O. Box 8216, Waco, Texas 76714-8216 (mail)
                       6400 Imperial Drive, Waco, Texas 76712 (deliveries only)
                       Attention:  Jim W. Moore
                       Facsimile No. 254-761-2960

With a copy to:        FH Partners LLC
                       P.O. Box 8216, Waco, Texas 76714-8216 (mail)
                       6400 Imperial Drive, Waco, Texas 76712 (deliveries only)
                       Attention:  Legal Department
                       Facsimile No. 254-761-2953

If to Buyer:           Shamrock Bank of Florida
                       895 Fifth Avenue South
                       Naples, Florida  34102
                       Facsimile No. 239-919-5191
                       Attention: Robert W. Carney, Senior Vice President

With a copy to:        James D. Vogel
                       Vogel Law Office
                       Suite B, Midwest Title Building
                       3936 Tamiami Trail North
                       Naples, Florida  34103
                       FAX:  (417) 447-4401

Any such notice shall be deemed received as follows: (a) if personally delivered, the date of delivery to the address of the person to receive such notice (the "Recipient"); (b) if sent by reputable overnight courier service, the date of delivery to the address of the Recipient; or (c) if sent by facsimile transmission, the date transmitted to the Recipient if sent by 5:00 p.m. (using the time then in effect at the address of the Recipient), and the next Business Day if sent after such time. Any notice sent by facsimile transmission also must be confirmed no later than the next Business

Day by sending a copy of the notice sent by facsimile transmission in the manner provided in subparagraph (a) or (b) above. Any party may change its address for notice by written notice given to the other at least five (5) calendar days before the effective date of such change in the manner provided in this Section.

13.3   **Brokers and Finders**. Buyer and Seller represent that no broker was involved in the negotiations and purchase and sale. In the event of a claim for broker's fees, finder's fees, commissions or other similar compensation in connection herewith: **(a)** Buyer, if such claim is based upon any agreement alleged to have been made by Buyer, shall indemnify Seller against, and hold Seller harmless from (using counsel reasonably satisfactory to Seller), any and all damages, liabilities, costs, expenses and losses (including, without limitation, attorneys' fees and costs) that Seller sustains or incurs by reason of such claim; and **(b)** Seller, if such claim is based upon any agreement alleged to have been made by Seller, shall indemnify Buyer against, and hold Buyer harmless from (using counsel reasonably satisfactory to Buyer), any and all damages, liabilities, costs, expenses and losses (including, without limitation, attorneys' fees and costs) that Buyer sustains or incurs by reason of such claim.

13.4   **Successors and Assigns**. Neither this Agreement nor any party's rights or interests hereunder may be assigned by such party without the prior consent of the other party, which consent may be withheld in that party's sole and absolute discretion, and any such attempted assignment by any party without the consent of the other party be null and void and of no force or effect; *provided that* Buyer may collaterally assign its rights under this Agreement to any lender providing funding for the purchase of the Loan. Subject to the foregoing, this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors and assigns. This prohibition on the assignment by Buyer of any rights under this Agreement does not prohibit the Buyer from selling the Loan or require the consent of the Seller to any sale or transfer of the Loan by Buyer to any other person, provided that the Buyer does not and has no right to assign any rights or remedies of Buyer against Seller under this Agreement and Buyer does not otherwise assign or attempt to assign any rights or interests under this Agreement in connection with any such sale, assignment or transfer of the Loan or any portion thereof. Any purchaser from Buyer shall only have such rights or interests as are provided to the purchaser under the agreement between Buyer and that purchaser and shall not have any claims or rights against the Seller under this Agreement or otherwise. Buyer acknowledges and agrees that Seller's representations and warranties set forth in Section 7.1 and the remedy provided in Section 7.3 terminate upon the Buyer's sale, transfer or assignment of the Loan or any portion thereof pursuant to Section 7.2 of this Agreement, if such representations and warranties and remedy have not been earlier terminated as a result of other events set forth in Section 7.2.

13.5   **Amendments**. This Agreement may be amended or modified only by a written instrument executed by Buyer and Seller.

13.6   **Interpretation**. Words used in the singular shall include the plural and vice-versa, and any gender shall be deemed to include the other. The captions and headings of the Articles and Sections of this Agreement are for convenience of reference only and shall not be deemed to define or limit the provisions hereof. Further, each party hereby acknowledges that such party and its counsel have reviewed and considered the effect of this Agreement. As such, the terms of this Agreement shall be fairly construed and the usual rule of construction, to the effect that any ambiguities herein should be resolved against the drafting party, shall not be employed in the interpretation of this Agreement or any amendments, modifications or exhibits hereto or thereto.

**13.7   Governing Law.**   This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

**13.8   Merger of Prior Agreements.**   This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral or written representations, statements, documents, understandings and agreements with respect thereto.

**13.9   No Recordation.**   Neither this Agreement nor any memorandum hereof shall be recorded.

**13.10   TIME OF ESSENCE. TIME IS OF THE ESSENCE OF EACH AND EVERY TERM AND PROVISION OF THIS AGREEMENT.**

**13.11   Confidentiality.**   Buyer hereby represents and warrants to Seller that Buyer is in full compliance with its obligations under the terms of any confidentiality agreement that Buyer executed and delivered to Seller. All records and all information, surveys, reports, tests, and studies relating to the Loan obtained by Buyer before or after the Effective Date, either by the observations and examinations of its agents and representatives or by Seller's disclosure, shall remain confidential. If the transaction contemplated herein fails to close for any reason, Buyer shall deliver to Seller, at no cost to Seller, the results and/or copies of all such records, information, surveys, reports, tests, and studies, and Buyer shall make no further distributions or disclosures of any such information, surveys, reports, tests, and studies.   Buyer and Seller agree that, to the extent reasonably practical, they shall keep the contents of this Agreement confidential and that no publicity or press release to the general public or otherwise with respect to this transaction shall be made by either party without the prior written consent of the other.

**13.12   Rights Cumulative; Waivers.**   The rights of each of the parties under this Agreement are cumulative and may be exercised as often as any party considers appropriate under the terms and conditions specifically set forth. The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right. Any defective or partial exercise of any such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

**13.13   Exhibits/Schedules.**   Exhibits A through D, inclusive, are attached hereto and incorporated herein by reference.

**13.14   Counterparts.**   This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which, when taken together, shall constitute one and the same instrument, with the same effect as if all of the parties to this Agreement had executed the same counterpart.

**13.15   No Intent To Benefit Third Parties.**   Seller and Buyer do not intend by any provision of this Agreement to confer any right, remedy or benefit upon any third party, and no third party shall be entitled to enforce, or otherwise shall acquire any right, remedy or benefit by reason of, any provision of this Agreement.

**13.16  Arbitration.**  Buyer and Seller agree to submit to binding arbitration any and all claims, disputes and controversies between or among them, whether in tort, contract or otherwise (and their respective employees, officers, directors, attorneys, and other agents) arising out of or relating to in any way the Loan and related documents which are the subject of this agreement.  Any arbitration proceeding shall be governed by The Federal Arbitration Act, and all applicable Texas statutes of limitation, and shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA").  Any arbitration proceeding shall be before a single arbitrator licensed to practice law in Texas selected according to the Commercial Arbitration Rules of the AAA.  The arbitrator shall decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are substantially similar to pre-hearing motions to dismiss for failure to state a claim or motions for summary adjudication.  Discovery shall be permitted, but shall be subject to scheduling by the arbitrator, and any discovery disputes shall be subject to final determination by the arbitrator.  The arbitrator shall award costs and expenses of the arbitration proceeding in accordance with the provisions

**13.17**  This paragraph left intentionally blank.

**13.18  Joint and Several Obligations.**  If Buyer is comprised of more than one person or entity, then all persons or entities that comprise Buyer shall be jointly and severally liable for all of the covenants, agreements, and obligations of Buyer contained in this Agreement.  No limited partner of the Buyer shall have any liability to Seller under this Section or otherwise under the terms of this Agreement.

**13.19  Severability.**  If any provision of this Agreement shall become illegal, invalid, unenforceable, or against public policy for any reason, or shall be held by any court of competent jurisdiction to be illegal, invalid, unenforceable, or against public policy, then such provision shall be severed from this Agreement and the remaining provisions of this Agreement shall not be affected thereby and shall remain in full force and effect.  In lieu of each provision that becomes or is held to be illegal, invalid, unenforceable, or against public policy, there shall be automatically added to this Agreement a provision as similar in substance to the objectionable provision as may be possible and still be legal, valid, enforceable, and in compliance with public policy.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

**BUYER:**              **Shamrock Bank of Florida**

By: _Robert W. Carney Jr_

Name: _Robert W. Carney Jr_

Title: _Senior Vice President_

**SELLER:**              **FH Partners LLC**

By: _____, S.V.P.

Name: _LONNIE R. ABRAHAMS_

Title: _SENIOR VICE PRESIDENT_

Title: _____

PLEASE READ DISCLAIMERS AND LIMITATIONS OF REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLES I, VII, VIII AND IX WHICH ARE RELIED UPON BY SELLER AND IS A CONDITION TO EXECUTION OF THIS AGREEMENT BY SELLER.

# EXHIBIT A

# FORM OF ALLONGE

## ALLONGE

This ALLONGE is affixed to and made a part of that certain Note dated _____, made by _____, payable to the order of _____, in the face principal amount of $_____, as such evidence of indebtedness has been amended, modified, supplemented, renewed, endorsed, negotiated, sold, assigned, conveyed, or otherwise transferred to date.

PAY TO THE ORDER OF _____ ("BUYER"), WITHOUT RECOURSE, REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, EXCEPT AS EXPRESSLY PROVIDED IN THAT CERTAIN LOAN SALE AGREEMENT, DATED AS OF _____, 2009, BETWEEN FH PARTNERS LLC AND BUYER.

**Dated:** As of _____, 2009.

SELLER(S):

**FH Partners LLC**

By: _____
Name: _____
Title: _____

# EXHIBIT B

# FORM OF ASSIGNMENT AND ASSUMPTION

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

_____

_____

_____

_____

_____

**Space Above Line For Recorder's Use Only**

### ABSOLUTE ASSIGNMENT AND ASSUMPTION
### OF MORTGAGE AND LOAN DOCUMENTS

This ABSOLUTE ASSIGNMENT AND ASSUMPTION OF MORTGAGE AND LOAN DOCUMENTS (this "**Assignment**") is made as of _____, 2009, by **FH Partners LLC**, a Texas limited liability company ("**Assignor**"), in favor of _____ ("**Assignee**").

1.     FOR VALUE RECEIVED, Assignor hereby absolutely and irrevocably endorses, negotiates, sells, assigns, conveys, and transfers to Assignee all of Assignor's right, title, and interest in and to the "**Loan**" (such term is defined in a Loan Sale Agreement dated as of _____, 2009, between Assignor and Assignee), including, without limitation, all of Assignor's right, title, and interest in and to the following:

2.     THIS ASSIGNMENT IS WITHOUT RECOURSE, REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, EXCEPT AS EXPRESSLY PROVIDED IN THAT CERTAIN LOAN SALE AGREEMENT, DATED AS OF _____, 2009, BETWEEN ASSIGNOR AND ASSIGNEE (the "**Loan Sale Agreement**").

3.     Assignee hereby agrees to and accepts the assignment described in <u>Paragraph 1</u> above.  Assignee hereby agrees to deliver to each person or entity currently obligated to pay and perform the obligations of the borrower under the Loan (the "**Borrower**") any notice required by law to inform such Borrower that Assignor has transferred its interest in the Loan to Assignee as of the date hereof.

4.     Assignee hereby acknowledges and agrees that it shall be solely responsible for compliance with any laws, rules, or regulations governing the ownership, servicing, and/or administration of the Loan from and after the Closing Date.

5.     The provisions of this Assignment shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective heirs, executors, administrators, successors and assigns.

**IN WITNESS WHEREOF,** Assignor and Assignee have executed this Absolute Assignment and Assumption of Mortgage and Loan Documents as of the date first set forth above.

**ASSIGNOR:**                    **FH Partners LLC**

By:_____
Name:_____
Title:_____

**ASSIGNEE:**                    **Shamrock Bank**

By:_____
Name:_____
Title:_____

THE STATE OF TEXAS          §
COUNTY OF McLENNAN          §

BEFORE ME, the undersigned, a Notary Public in and for said county and state, on this day personally appeared _____, who is the _____ for FH Partners LLC, a Texas limited liability company, known to me to be the person whose name is subscribed to the foregoing instrument, and he acknowledged to me that he executed the same for the purposes and consideration therein expressed, as the act and deed of said corporation and partnership and in the capacity therein stated.

Given under my hand and seal of office this _____ day of _____, 2009.


_____
Notary Public, State of Texas


THE STATE OF FLORIDA       §
COUNTY OF COLLIER          §

BEFORE ME, the undersigned, a Notary Public in and for said county and state, on this day personally appeared _____, who is the _____ for Shamrock Bank of Florida, a _____, known to me to be the person whose name is subscribed to the foregoing instrument, and he acknowledged to me that he executed the same for the purposes and consideration therein expressed, as the act and deed of said _____ and in the capacity therein stated.

Given under my hand and seal of office this _____ day of _____, 2009.


_____
Notary Public
My commission expires:_____

I hereby certify the address of the within named Assignee to be:



By:_____
Name:_____
Title:_____

# EXHIBIT C

## FORM OF NOTICE TO OBLIGOR

_____, 2009

_____
_____                    *Certified Mail Return Receipt Requested*
_____
_____

Re:

Dear Borrower:

This is to notify you that **FH Partners LLC** has sold its interest in the above-referenced loan (the "**Loan**"), to _____ (the "**New Lender**").

More particularly, the Loan is evidenced by that certain _____ _____as such evidence of indebtedness has been amended, modified, supplemented, renewed, endorsed, negotiated, sold, assigned, conveyed, or otherwise transferred to date, along with any security agreements, liens, guarantees, or other collateral.

The New Lender is now solely responsible for the servicing and administration of the Loan. Accordingly, in order to receive proper credit for future payments under the Loan, please direct all future payments under the Loan and all future communications in connection with the Loan to:

Please contact the New Lender at the address and phone number given above if you have any questions or comments concerning this matter. Thank you for your cooperation.

Very truly yours,

**FH Partners LLC**

By:_____
Name:_____
Title:_____

IN THE CIRCUIT COURT
FOR THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

**FILED**
DEC 19 2012
CLERK OF CIRCUIT COURT #9
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

SHAMROCK BANK OF FLORIDA,      )
                               )
        Plaintiff,             )
                               )
    v.                         )        Cause No. 12-L-2053
                               )
FIRST AMERICAN TITLE INS. CO., )
                               )
        Defendant.             )
                               )

### ENTRY OF APPEARANCE

COME NOW Byron Carlson Petri & Kalb, LLC and hereby enter their appearance on

behalf of Plaintiff, Shamrock Bank of Florida.

Respectfully submitted,

BYRON CARLSON PETRI & KALB, LLC

By: _____
    Christopher W. Byron, #6230810
    Brian R. Kalb, #6275228
    411 St. Louis Street
    Edwardsville, IL  62025
    Phone: 618.655.0600
    Fax:    618.655.4004

12-L-
Page 1 of 1

**EXHIBIT**

C

IN THE CIRCUIT COURT
FOR THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

**FILED**

DEC 19 2012

CLERK OF CIRCUIT COURT #9
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

SHAMROCK BANK OF FLORIDA,          )
                                                             )
              Plaintiff,                           )
                                                             )
       v.                                            )        Cause No.  12-L-2053
                                                             )
FIRST AMERICAN TITLE INS. CO.,     )
                                                             )
              Defendant.                        )
                                                             )

### JURY DEMAND

COME NOW Byron Carlson Petri & Kalb, LLC and hereby requests a trial by jury of

twelve (12) in this cause on all counts.

Respectfully submitted,

BYRON CARLSON PETRI & KALB, LLC

By: _____
        Christopher W. Byron, #6230810
        Brian R. Kalb, #6275228
        411 St. Louis Street
        Edwardsville, IL 62025
        Phone: 618.655.0600
        Fax:    618.655.4004

12-L-
Page 1 of 1

**EXHIBIT**

tabbies

D

IN THE CIRCUIT COURT
FOR THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

**FILED**

DEC 19 2012

CLERK OF CIRCUIT COURT #9
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

SHAMROCK BANK OF FLORIDA,          )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        Cause No. 12-L-2053
                                   )
FIRST AMERICAN TITLE INS. CO.,     )
                                   )
            Defendant.             )

## AFFIDAVIT

This Affidavit is made pursuant to Supreme Court Rule 222(b). Under the penalties of

perjury as provided in Sections 1-109 of the Illinois Code of Civil Procedure, the undersigned

certifies that the money damages sought by Plaintiff exceeds $50,000.

_____
Christopher W. Byron


Subscribed and sworn to before me, a notary public, this *19th* day of
December, 2012.



_____
Notary Public

OFFICIAL SEAL
JAMI MILLER
MY COMMISSION EXPIRES
SEPTEMBER 21, 2014

12-L-
Page 1 of 1

**EXHIBIT**

E

December 20, 2012

IN THE CIRCUIT COURT
FOR THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

CASE NUMBER: 2012 L 002053

SHAMROCK BANK OF FLORIDA

Plaintiff(s)

VS.

FIRST AMERICAN TITLE INS CO

Defendant(s)



FILED

DEC 2 0 2012

CLERK OF CIRCUIT COURT #6
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

ASSIGNMENT ORDER

The above case is hereby assigned to the Honorable  A.A. MATOESIAN for setting and disposition.

Clerk to send copies of this Order to the attorneys of record and any pro se party.

DATE: December 20, 2012

s/Ann Callis
Chief Judge

EXHIBIT

F

                         BREACH OF CONTRACT                    Time: 16/08/10
                                                              Page:    1
      2012 L   002053   Judge: MATOESIAN A.A.      From  0/00/0000 To 99/99/9
                                                              User: STOICHEF
         Case Names_____ Attorney Names_____  Wsid: CIVIL47G0
         SHAMROCK BANK OF FLORIDA BYRON CHRISTOPHER W
                    VS                                        All Entries Fo
         FIRST AMERICAN TITLE INS
   __Date__
   12/19/2012 BREACH OF CONTRACT Fee $219.00  Amt $50000.01
         Plaintiff SHAMROCK BANK OF FLORIDA
         Defendant FIRST AMERICAN TITLE INS CO

   12/19/2012 CLEARED FOR PUBLIC

   12/19/2012 AFFIDAVIT FILED BY  Plaintiff SHAMROCK BANK OF FLORIDA

   12/19/2012 ENTRY OF APPEARANCE FILED BY  Plaintiff SHAMROCK BANK OF FLORIDA

   12/19/2012 Jury Demand 12 People-New Case Fee $212.50  PAID
         Plaintiff SHAMROCK BANK OF FLORIDA
         Judge:MATOESIAN A.A.    Clerk:AB    M

   12/19/2012 MINUTE RECORD
         Document MINREC.DOC Was Printed

   12/20/2012 JA Assignment Order HONORABLE JUDGE AA MATOESIAN
         Document JAORDER.DOC Was Printed

   12/20/2012 SUMMONS ISSUED ON DEFT AND PUT ON COUNTER FOR P/U
         Document SU30DAY.DOC Was Printed

    1/25/2013 Copies Fee $3.50  Plaintiff SHAMROCK BANK OF FLORIDA

    1/25/2013

EXHIBIT
G