## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**SHAMROCK BANK OF FLORIDA,**
*as assignee of* **MERIDIAN BANK,**

**Plaintiff-Counterclaim Defendant,**

**v.**

**FIRST AMERICAN TITLE INS. CO.,**

**Defendant-Counterclaim Plaintiff.**          **Case No. 13-cv-92-DRH-PMF**


**MEMORANDUN & ORDER**

**HERNDON, Chief Judge:**

## I.   INTRODUCTION

Shamrock Bank of Florida (Shamrock), as assignee of Meridian Bank (Meridian), brings its complaint against First American Title Ins. Co. (First American) for breach of contract.    First American countersues for a declaratory judgment.   The following motions are now before the Court:

Shamrock moves for summary judgment on Count I of its First Amended Complaint and on First American's Counterclaim for Declaratory Judgment (Doc. 26), for summary judgment on First American's affirmative defenses (Doc. 30), to strike portions of First American's undisputed facts as set forth in its memorandum in support of motion for summary judgment pursuant to F.R.C.P. 56(c)(2) (Doc. 39), and to supplement the summary judgment record (Doc. 43).   First American moves for summary judgment (Doc. 27), and to strike portions of Shamrock's facts pursuant to F.R.C.P. 56(c)(2) (Doc. 41).

For the reasons stated below, Court finds as follows:

As for Shamrock, the Court grants in part its motion for summary judgment on Count I of its First Amended Complaint and on First American's Counterclaim for Declaratory Judgment (Doc. 26), grants its motion for summary judgment on First American's affirmative defenses (Doc. 30), grants its motion to supplement the summary judgment record (Doc. 43), and denies its motion to strike portions of First American's undisputed facts (Doc. 39).

As for First American, the Court denies its motion for summary judgment (Doc. 27) and grants in part its motion to strike portions of Shamrock's facts (Doc. 41).

## II.   UNDISPUTED FACTS[1]

### a.  The Simmons Convey the Property to Great River

This dispute begins with a real estate transaction entered into on January 22, 2007, between John and Jayne Simmons (the Simmons), as Trustees of the River House Trust dated August 21, 2003, and Great River Enterprises Limited Partnership No. 1 (Great River).   Lloyd Tomer (Tomer) was Great River's principal shareholder (Doc. 29-1, Tomer Sept. 15, 2011, Depo., p. 15 ).   Tomer's attorney, Raymond Stillwell (Stillwell) represented Great River in the transaction (Doc. 28-2, Tomer Jan. 20, 2011 Depo., p. 18).   The Simmons conveyed the real estate located at 12 Danforth, Alton, Illinois (the Property), commonly referred to as the Olin Mansion, to Great River.   In exchange for the conveyance, Great River agreed to deliver to the Simmons 1,000,000 shares of YTB International, Inc. (YTB) (collectively, the Real Estate Agreement) (Doc. 28-1, § 2).

---

[1] This section is of course the Court's interpretation of what facts are "undisputed."

Paragraph 3.1 of the Real Estate Agreement, titled, "Possibility of Reverter," provides that the Property would revert back to the Simmons on December 31, 2011, unless certain conditions were met as to YTB stock.   The Real Estate Agreement provided that, "the Reversion Date will be accelerated automatically upon the occurrence of . . . the Purchaser's waste of the Property" (*Id.* at pp. 3-4).   A trustee's deed dated January 24, 2007, documents the conveyance (Trustee's Deed) (Doc. 29-4). The Trustee's Deed notes, "[t]he Property is subject to a possibility of reverter, the specific terms and conditions of which are set forth in Section 3.1 of [the Real Estate Agreement] . . . which terms and conditions are hereby incorporated" (*Id.* at p. 3).   The Trustee's Deed was recorded in the Madison County Recorder's Office on February 12, 2007 (*Id.* at p. 9).

### b.  Great River Loan, Participation Agreement, and Title Policy

In late 2007, Tomer decided to take a loan against the Property to make some improvements.   Tomer states he spoke with Brad Rench (Rench), president and CEO of Meridian, regarding the loan.   Tomer states Rench was the only Meridian personnel he spoke with regarding the loan (Doc. 29-5, Tomer Jan. 20, 2011, Depo., pp. 7-10).

According to Robert Carney (Carney), in November 2007, the vice president in charge of lending for Shamrock, Clay Winfield (Winfield) a member of the Board of Directors at Meridian, Shamrock, and YTB, approached Carney about Shamrock entering into a participation agreement with Meridian, whereby Shamrock would purchase an interest in the Great River Loan (Participation Agreement) (Doc. 28-7, Carney Depo. pp. 9-17).

The parties dispute how the Great River Loan and the Participation Agreement came to fruition.  The extent these disputes are material remains to be seen.  However, in the Court's opinion, the following is undisputed:

Through the loan underwriting process, Meridian ordered a title commitment from First American.  First American issued a title commitment; dated November 30, 2007, file no. 1753426 (Title Commitment), to Meridian.  The Title Commitment did not identify the Trustee's Deed or the "Possibility of Reverter" as an exception (Doc. 29-7).

On December 6, 2007, Meridian and Great River executed a promissory note, titled, "Universal Note," in which Meridian agreed to loan Great River $1,300,000.00 based on a line of credit.  Great River agreed to pay Meridian on demand, or if no demand was made, then, "monthly payments of accrued interest calculated on the amount of credit outstanding beginning 01-06-2008 and principal due on 12-06-2008" (Great River Loan) (Doc. 29-9).   Also on December 6, 2007, Great River executed several documents incidental to the Universal Note: Agreement to Provide Insurance, Disbursement Authorization, Guaranty (James Tomer), Guaranty (Christine Tomer), Commercial Security Agreement and Collateral Receipt (collectively, Loan Documents) (Doc. 29-10). All Loan Documents are between Great River and Meridian.  Great River also executed a mortgage on the Property in favor of Meridian securing the Universal Note for the $1,300,000.00 line of credit on December 6, 2007. The lien the Insured Mortgage created was subject to existing encumbrances on the Property, i.e., the "Possibility of Reverter" (Insured Mortgage) (Doc. 29-11).

As for the Participation Agreement between Meridian and Shamrock, a copy was forwarded by Meridian to Shamrock after Meridian entered the Universal Note with

Great River (Doc. 29-12).[2]   Shamrock's Directors Loan Committee approved the Participation Agreement on December 10, 2007 (Doc. 28-14). Winfield abstained (*Id.*). Pursuant to the Participation Agreement, Meridian, as the originating lender and seller, agreed to sell Shamrock, the participating lender and purchaser, a share in the Great River Loan for $1,250,000.00 with a variable interest rate of 7.5%.  Meridian agreed to pay Shamrock, on a *pro rata* basis, 96.15% of the money it received from Great River and to bear all costs of servicing and administering the Great River Loan. The Participation Agreement states Shamrock agreed to purchase participation in the Great River Loan "without recourse to" Meridian.  It further states a, "First Mortgage on [the Property] and assignment of [YTB] stock for 2,000,000 shares" secured the Great River Loan (*Id.*).

When Great River made a request for money, Meridian would notify Shamrock to Forward Meridian money to Meridian's account in proportion to Shamrock's *pro rata* share of the Participation Agreement.   Meridian would disburse the full amount requested directly to Great River.  Great River owned Meridian $1,300,000.00 pursuant to the Universal Note (Doc. 29-8, Rench Depo., pp. 14, 48).  The full amount allowed under the Universal Note was advanced to Great River (Doc. 28-20).

On December 11, 2007, for a premium of $1,300.00 (Doc. 29-13, Rekart Depo., p. 54), First American issued a loan policy of title insurance, policy no. 1753426, to Meridian, its successors and assigns, in the amount of $1,300,000.00 for the Property (Title Policy) (Doc. 29-14). The Title Policy provides coverage "against loss or damage,

---

[2] Two copies of the Participation Agreement have been submitted. One contains only the signature of Brad Rench (Rench), former president and CEO of Meridian, and the other has the signatures of both Rench and Don York (York), a director of Shamrock. Both contain the type-written date "12-6-2007" at the top (Doc. 29-12).  According to Carney, Shamrock (York) did not execute the Participation Agreement until it had reviewed the Title Commitment (Doc. 29-6, Carney Depo., p. 104).

not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of: Title being vested other than as stated in Schedule A." Schedule A does not reference the "Possibility of Reverter" (*Id.*).

### c. Meridian Fails

On October 10, 2008, the Department of Financial and Professional Regulation of the Illinois Division of Banking closed Meridian.  The FDIC was named the receiver and charged with winding up Meridian's business affairs (Receiver) (Doc. 29-15, Campagna Aff.).  On December 17, 2008, the FDIC, as the owner and holder of Meridian's interest in the Great River Loan and Title Policy due to its status as the Receiver, sent First American a letter providing it notice of a potential claim.  The FDIC stated First American failed to note an exception for the "Reversionary Interest," and thus caused the FDIC to have a junior lien on the Property. Therefore, it submitted its claim to First American, "to be made whole on the subject $1,300,000 [Great River Loan] under Meridian's lender's policy." The FDIC further notified First American that the Simmons were at that time considering enforcing the "Reversionary Provision" (*See* Doc. 29-15).

On February 13, 2009, the FDIC entered into a loan sale agreement with FH Partners, LLC (FDIC LSA).  The FDIC assigned Meridian's interest in the Great River Loan[3] to FH Partners, LLC (FH Partners) (*See id*. at pp. 7-46).[4]  The FDIC recorded an Assignment of Loans and Liens with the Madison County Recorder of Deeds (Doc. 29-16, Butler Aff., Ex. A, p. 6).

---

[3] The parties dispute whether claims under the Title Policy were assigned to FH Partners.

[4] First American states, "[t]here is no evidence that Shamrock consented in writing to the assignment of [Meridian's] interest in the Great River loan as required by the Participation Agreement and the validity of the assignment to FH Partners is therefore in dispute" (Doc. 28, p. 8). Shamrock responds that it has never challenged the validity of the assignments and it had the power to waive provisions of the contract for its benefit.  *See Whalen v. K-Mart Corp.*, 519 N.E.2d 991, 994 (Ill. App. 1988). The Court is in agreement with Shamrock.

After the FDIC learned of the "Possibility of Reverter," Tomer's attorney, Stillwell, contacted Shamrock and advised: 1. Great River was about to go into default on the Great River Loan, and 2. Great River's title to the Property was subject to the "Possibility of Reverter."[5]  On August 25, 2009, Shamrock, through its attorney James Vogel (Vogel), sent First American notice of a claim of title or potential claim of title adverse to the Insured Mortgage as referred to in the Title Policy (Doc. 29-17).  Vogel also stated Shamrock might purchase FH Partners' interest in the Great River Loan and asked for prior confirmation that First American would provide coverage for the purchase amount (Doc. 29-17).  Adriana Duran, claims attorney and recovery specialist for First American, concluded the "Possibility of Reverter" was omitted from the Title Commitment (Doc. 29-18, Duran Depo., pp. 18-19), and deferred to Shamrock's discretion in its purchase of the Universal Note (Doc. 29-19, p. 2).

On September 15, 2009, Carney, of Shamrock, sent Tomer a letter declaring Great River in default under the terms of the Loan Documents (Doc. 28-26).  On November 4, 2009, FH Partners entered into a loan sale agreement with Shamrock (FH Partners LSA) (Doc. 29-16, Ex. B).  Shamrock and FH Partners entered into an absolute assignment and assumption of mortgage and loan documents (Absolute Assignment), which was recorded with the Madison County Recorder of Deeds on November 30, 2009 (*Id.* at Ex. C).

### d. "Possibility of Reverter" Triggered

Great River committed waste and neglect of the Property by failing to replace boilers and pay real estate taxes (Doc. 29-5, Tomer Jan. 20, 2011 Depo., pp. 42-43).

---

[5] First American disputes whether Meridian and/or Shamrock had "knowledge" of the "Possibility of Reverter" prior to this time.

The Simmons and Great River entered into an agreement regarding reversion on January 15, 2010 (Reversion Agreement), wherein the parties agreed that the reversion date had accelerated automatically and that title to the Property had reverted to the Simmons.   A deed evidencing the transfer was recorded with the Madison County Recorder of Deeds on January 22, 2010 (Doc. 29-20).

### e. Madison County Litigation

On February 25, 2010, the Simmons brought an action to quiet title against Shamrock in the Circuit Court of Madison County, Illinois. *See John and Jayne Simmons, et al. v. Shamrock Bank of Florida, et al.* (2010-CH-245).   First American defended Shamrock under a reservation of rights.   On October 25, 2011, the Honorable Clarence Harrison entered judgment in favor of the Simmons and against Shamrock, effectively foreclosing any interest Shamrock had in the Property (the Judgment) (Doc. 29-21).   On October 10, 2012, the Illinois Fifth District Court of Appeals affirmed the Judgment (Doc. 29-22).

Shamrock obtained a judgment against Tomer on June 22, 2011 (Doc. 29-23).   Shamrock received right and title to the YTB Stock, along with various other assets (Doc. 29-24).   Shamrock has not been able to collect on these assets (Doc. 29-6, Carney Depo., p. 96; Doc. 29-26, Kvetko Depo., p. 28).   As of July 29, 2013, the trading price for YTB stock was $0.00 (Doc. 29-27).

First American removed this action from the Circuit Court for the Third Judicial Circuit, Madison County, Illinois, pursuant to diversity jurisdiction, 28 U.S.C. § 1332 (Doc. 2).   Shamrock's First Amended Complaint brings Count I: Breach of Contract (Doc. 20).   Shamrock alleges First American issued the Title Policy to Meridian, its

successors and assigns.  Shamrock alleges Meridian, through FH Partners, assigned the Title Policy to Shamrock.  And Shamrock further alleges the Title Policy insures against any defect in or lien encumbrance in the title to the Property.

Shamrock states that had First American disclosed to Meridian and/or Shamrock the Trustee's Deed or "Possibility of Reverter" contained therein, Meridian would not have issued the Great River Loan and Shamrock would not have entered the Participation Agreement. Shamrock cites First American's alleged breach of the Title Policy and asks for damages in the amount of $1,300,000.00 million dollars. Additionally, because First American chose to pursue its rights and was unsuccessful, under Section 5 of the Policy Conditions, Shamrock alleges the amount of insurance increases by 10% (*See* Doc. 20).    Shamrock moves for summary judgment, requesting that the Court enter judgment in its favor on Count I and against First American for $1,430,000.00,  plus  pre-judgment  interest  (Doc.  26).  Shamrock  also  moves  for judgment in its favor on certain affirmative defenses of First American (Doc. 30), and to supplement the summary judgment record (Doc. 43).

As to First American's counterclaim for declaratory judgment, it alleges Meridian contributed  $50,000.00  of  the  Great  River  Loan,  while  Shamrock  contributed  the remaining $1,250,000.00.  The Title Policy does not expressly identify Shamrock and it does not insure the Participation Agreement.  First American alleges the FH Partners LSA excluded from the transfer to Shamrock any, "right, title and interest of the FDIC in and to any and all claims that the FDIC has or might have against any party from whom the FDIC or Meridian [] contract[ed] for title insurance in connection with the making, insuring or servicing the loan."  Further, "[a]ccording to the [FH Partners LSA], all such

interests of the FDIC and Meridian [] were retained by the FDIC under the terms of the FDIC [LSA] and FH Partners does not claim or own any right or interest in such claims or interests of the FDIC and Meridian []."

First American additionally alleges Meridian's president and CEO, Brad S. Welch (Welch), "had direct knowledge of the possibility of reverter that extinguished the Insured Mortgage," and that Shamrock also "had knowledge of the possibility of reverter." As a "successor in ownership of the indebtedness," First American alleges Shamrock is entitled to $50,000.00, if anything. First American seeks judgment in its favor declaring that it is not liable to Shamrock because Meridian and Shamrock had knowledge of the possibility of reverter at the time the Title Policy was issued and alternatively, that Shamrock's actual damages are limited to an amount between $45,000.00 and $50,000.00 (Doc. 12). First American moves for summary judgment (Doc. 27).[6]

### III.   STANDARD AND APPLICABLE LAW

The parties do not dispute the applicability of the federal summary judgment standard, *see* Fed. R. Civ. P. 56, or Illinois substantive law to this diversity action. *See*

---

[6] Shamrock moves to strike various statements from First American's statements of undisputed facts as constituting inadmissible legal opinion and testimony precluded by the integration clause of the Participation Agreement (Doc. 39). The Court shall not recite the specific statements herein and refers the reader to the motion. As for the statements Shamrock believes are inadmissible legal opinion, the Court denies Shamrock's request as the Court does not feel the cited statements are inadmissible legal opinions. However, the Court does not feel the statements are material to the issues before it. Further, as to the statements Shamrock feels are inadmissible parol evidence, precluded by the integration clause of the Participation Agreement, the Court agrees with First American that the Court is not being called upon to interpret the Participation Agreement. First American generally relies on the cited statements in support of its argument that Shamrock did not rely on the Title Commitment when it entered the Participation Agreement. For the reasons stated in the Court's above ruling, Shamrock's reliance is not material to this dispute. However, to the extent Shamrock's reliance is relevant, the Court does not feel the cited statements are inadmissible parol evidence that are used to contradict the express written terms of the Participation Agreement and it shall rely upon them if relevant and material to this dispute. Thus, Shamrock's motion to strike is denied (Doc. 39).

*Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 525 (7th Cir. 2013).

Summary judgment is proper when the pleadings, discovery, and disclosures establish that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Winsley v. Cook Cnty.*, 563 F.3d 598, 602–03 (7th Cir. 2009); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial burden of establishing the absence of fact issues and its entitlement to judgment as a matter of law.  *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323).  Once the movant has shown the facts entitle it to judgment in its favor, the burden shifts to the non-moving party to identify some evidence in the record that establishes a triable factual issue.  *Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010).

A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Pugh v. City of Attica, Indiana*, 259 F.3d 619, 625 (7th Cir. 2001).  The Court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question."  *McGrath v. Gillis*, 44 F.3d 567, 569 (7th Cir. 1995).

## IV.   ARGUMENTS AND APPLICATION

"[T]he purpose of a title insurance policy . . . is to protect a purchaser of real estate against title surprises." *Citicorp Sav. of Ill. v. Stewart Title Guar. Co.*, 840 F.2d 526, 529 (7th Cir. 1988) (quoting *Pohrer v. Title Ins. Co.*, 652 F. Supp. 348, 352 (N.D. Ill. 1987) (Moran, J.)).  In a nutshell, Shamrock argues that because First American

admits it failed to disclose the "Possibility of Reverter," the focus of its motion for summary judgment on its Count I centers on 1. Shamrock's standing to assert its breach of contract claim against First American, and 2. Shamrock's right to recover $1,430,000.00 as assignee of Meridian.

**1.   Shamrock's Standing Under the Title Policy**

Shamrock argues it has standing to bring its breach of contract claim on the Title Policy because 1. It is an "owner" and/or "successor in ownership of the Indebtedness," and 2. It is an assignee of the Title Policy.

**a. "owner of the Indebtedness"**

The Title Policy provides coverage against loss or damage sustained or incurred by the "Insured." "Insured" is defined under the Title Policy as, "[t]he insured named in Schedule A," i.e., "Meridian, its successors and assigns" (Doc. 29-14, p. 2, ¶ 1(e)). It also includes:

> (A) **the owner of the Indebtedness and each successor in ownership of the Indebtedness**, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is obligor under the provisions of Section 12(c) of these Conditions;

(*Id.* at ¶ 1(e)(i)(A)). "Indebtedness" denotes:

> The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of
> (i) the amount of the principal disbursed as of the Date of the Policy;
> (ii) the amount of the principal disbursed subsequent to the Policy;
>
>                         .     .     .

(*Id.* at ¶ 1(d)).

Shamrock argues that pursuant to the Participation Agreement, Meridian and Shamrock agreed that Shamrock would be "the legal and equitable owner" of its share

in the Great River Loan and thus it is an "Insured" under the Title Policy as it was an "owner of the Indebtedness" once the Participation Agreement was executed (*See* Doc. 29-12, p. 2, ¶ 2).

First American argues first that Shamrock has waived this argument as its First Amended Complaint alleges it has standing as it was assigned the Title Policy from FH Partners.  Federal pleading rules require that a complaint provide "'fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  The First Amended Complaint, brought explicitly in the name of Shamrock, as assignee of Meridian, cites the entire definition of "Insured" from the Title Policy and states, "[p]ursuant to the terms of the Loan Sale Agreement, Meridian, through FH Partners, assigned the [Title] Policy to Shamrock."   And further, "Shamrock, as assignee of Meridian, has incurred an actual monetary loss . . . WHEREFORE, Plaintiff, Shamrock [], as assignee of Meridian [] requests the Court enter judgment in its favor" (*See* Doc. 20).

The Seventh Circuit has noted more than once that, "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Grayson v. O'Neill,* 308 F.3d 808, 817 (7th Cir. 2002); *Trade Fin. Partners, LLC v. AAR Corp.,* 573 F.3d 401, 412 (7th Cir. 2009).  In this case, Shamrock's First Amended Complaint provided notice of its claim as an "Insured" under the Title Policy. However, it did not provide express notice of its theory that the Participation Agreement made it an "owner of the Indebtedness" and thus an "Insured" under the Title Policy.

As the Court feels Shamrock's argument fails on its merits, the Court does not expressly address whether Shamrock waived this theory by raising it for the first time in its motion for summary judgment.   Shamrock asks this Court to look to the Participation Agreement to inform the meaning of "Insured" under the Title Policy.   The Title Policy unambiguously defines "Insured," as, "Meridian [], its successors and assigns," including, "*the* owner of the Indebtedness and each successor in ownership of the Indebtedness" (emphasis added).   "Indebtedness" is defined as "[t]he obligation secured by the Insured Mortgage."   The "obligation" is the Universal Note.   The Universal Notes makes no reference to Shamrock and neither does the Title Policy.   Shamrock takes great pains in the remainder of its briefing to convince the Court that the Participation Agreement and Universal Note are separate and distinct agreements.   The Court finds Shamrock is not an "Insured" under the Title Policy due to the rights bestowed upon it under the Participation Agreement.

### b. Shamrock is a "successor in ownership of the Indebtedness"/ assignee of the Title Policy

Additionally, Shamrock states it is an "Insured" as it is a "successor in ownership of the Indebtedness" and alternatively, an assignee of the Title Policy.   Again, the obligation secured by the Insured Mortgage is the Universal Note, requiring the payment of $1,300,000.00.   Thus, the amount of "Indebtedness" is the principal; $1,300,000.00. Shamrock states it is the "successor in ownership of the Indebtedness" and thus an "Insured" under the Title Policy, as the Universal Note was assigned by the FDIC to FH Partners who then assigned it to Shamrock through the FH Partners LSA.

First American's response states that Shamrock's recovery as a "successor in ownership of the Indebtedness," is limited to $50,000.00.   The Court shall address First

American's arguments as to the amount of recovery below.   However, the Court finds that Shamrock is a "successor in ownership of the Indebtedness" and thus an "Insured" under the Title Policy.

Alternatively, Shamrock states it has standing to sue as it is an assignee of the Title Policy and thus an assignee of the action Meridian has against First American on the Title Policy.

The FDIC LSA, between the FDIC (Seller) and FH Partners (Buyer), Article II, Section 2.1, states:

> **Terms and Conditions of Sale**: Seller agrees to sell, assign, transfer and convey to Buyer, and Buyer agrees to purchase and accept from Seller, all the right, title and interest of Seller, . . . , in and to each Loan in the Loan Pool(s) on a servicing-related basis, and all rights in the Property pursuant to the Collateral Documents.

(Doc. 29-15, p. 18).   "Loan" under the FDIC LSA denotes, "all rights, powers, liens or security interests of Seller in or under the Collateral Documents" (*Id.* at p. 15). "Collateral Documents" include each, "loan agreement or other agreement or document, . . . securing in any manner the performance or payment by any Borrower of its obligations or the obligations of any other Borrower under any Note evidencing a Loan" (*Id.* at p. 13).

Shamrock argues that the Title Policy is a "document" securing payment under the Universal Note.   In addition to the FDIC LSA, it offers the affidavit of Colette Campagna (Campagna), the FDIC receivership specialist responsible for Meridian's account (Doc. 29-15, pp. 2-4).   Campagna states, "[i]t was the intent of the FDIC as Receiver to include the Title Insurance Policy with the Loan" (*Id.* at p. 3).

First American moves to strike Campagna's statement concerning the FDIC's intent, arguing the FDIC LSA is facially unambiguous and thus Campagna's statement is inadmissible parol evidence.   Shamrock responds that the Seventh Circuit has recognized that in the context of assignments, even in unambiguous contracts, Illinois courts have looked to extrinsic evidence to inform the parties' intent and scope of the assignment. *See Kaplan v. Shure Bros., Inc.,* 266 F.3d 598, 605-06 (7th Cir. 2001) (compiling Illinois cases).   And further, the parol evidence rule only applies to the parties to the written contract. *See id.*   The Court is in agreement and will consider Campagna's statement.

First American also argues that the Title Policy did not secure payment of the Universal Note.   First American cites two non-binding cases, *Heyd v. Chicago Title Ins. Co.,* 354 N.W.2d 154, 156 (Neb. 1984); *Karl v. Commonwealth Land Title Ins. Co.,* 20 Cal. App. 4th 972, 24 Cal. Rptr. 2d 912 (1993), which do not persuade the Court that the Title Policy is not included within the broad definition of "Collateral Documents" contained within the FDIC LSA.   And further, the FDIC did not retain claims on the Title Policy (See FDIC LSA, Doc. 29-15, Section 2.7(d), p. 20).   On the basis of the above, the Court finds the Title Policy and claims thereon were assigned to FH Partners.

Shamrock then cites FH Partners' assignment of the Title Policy to Shamrock through the FH Partners LSA.   Article III, "Title Insurance," states, "Seller [FH Partners] shall assign to Buyer [Shamrock] all of Seller's right, title, and interest in and to any title insurance policy for land, buildings, structures and improvements located thereon serving as security for the Loan (the 'Real Property Collateral'), if any" (Doc. 29-16, p. 15).

In opposition, First American cites Article 1, Section 1.1, of the FH Partners LSA:

> Buyer and Seller agree that the sale of the Loan pursuant to this Agreement will exclude the transfer to Buyer of any right, title and interest of the FDIC…, and Bank in and to any and all claims of any nature whatsoever that might now exist or hereafter arise, whether known or unknown, that the FDIC has or might have … (d) against any appraiser or other party from whom the FDIC or Bank or any servicing agent contracted for services or title insurance in connection with the making, insuring or servicing of the Loan…

(Doc. 29-16, p. 12).  First American argues it is an "other party" referred to in Section 1.1 and thus any claims against First American were excluded from the sale.  Shamrock argues that the FDIC did not retain claims under the Title Policy and that First American's interpretation would render Article III, "Title Insurance," meaningless and thus "other party" refers to third party providers and not First American.

Shamrock additionally moves to supplement the summary judgment record to include an "Amended Loan Sale Agreement," which purports to amend Article 1, Section 1.1, of the FH Partners LSA.  The Amended Loan Sale Agreement states that it amends Section 1.1 to the extent there is ambiguity concerning assignment of the Title Policy and claims thereon from FH Partners to Shamrock.   The Amended Loan Sale agreement adds the following language to Section 1.1(d):

> The foregoing exclusions shall not apply to any claims for title coverage under the title insurance policy issued by First American Title Ins. Co., described as Loan Policy of Title Insurance, Policy Number 1753426, and such claims have been assigned pursuant to Article III herein.

(Doc. 43-1).   First American of course argues the Court should not exercise its discretion in granting the motion to supplement.  First American cites *Vance v. Ball State Univ.,* 646 F.3d 461 (7th Cir. 2011), wherein the Seventh Circuit affirmed a district court's denial of a motion to supplement the summary judgment record with

additional "individual acts" as evidence of a hostile work environment claim after the deadlines for discovery and dispositive motions had "long passed." *Id.* at 469.

The Court accepts Shamrock's interpretation. To summarize, the FDIC did not retain claims on the Title Policy (*See* FDIC LSA, Doc. 29-15, Section 2.7(d), p. 20). The FDIC assigned claims that Meridian would have had on the Title Policy to FH Partners. Article III of the FH Partners LSA unambiguously assigns FH Partners' "right, title, and interest" in the Title Policy to Shamrock. Article 1, Section 1.1, of the FH Partners LSA excludes claims that the FDIC retained, but because the FDIC did not retain claims under the Title Policy it assigned those claims, pursuant to Article III, to Shamrock.

Alternatively, to the extent there is an ambiguity, the Court grants Shamrock's motion to supplement. As to First American's complaint of untimeliness, the Court notes that discovery had not yet closed when Shamrock moved to supplement. First American could have deposed the signatories to the Amended Loan Sale Agreement or even asked the Court for an extension of the discovery period, but failed to do so. While of course the dispositive motion deadline set forth in Magistrate Judge Frazier's scheduling order had passed, First American cannot cite any specific prejudice arising from the timing of Shamrock's request. The Amended Loan Sale Agreement is offered to clarify an ambiguity, to the extent there is one, in the FH Partners LSA. As this amendment merely coincides with Shamrock's previously stated argument, the Court cannot see how its addition to the record could unduly prejudice First American. Thus, for all the reasons stated above, it is clear to the Court that the FH Partners LSA assigned Shamrock the right to sue under the Title Policy.

Thus, Shamrock is an "assignee" of the Title Policy as it has "rights" to the Title Policy, "transmitted by particular title, such as sale, gift, legacy, transfer or cession." *Sauls v. Cox*, 67 N.E.2d 187, 191 (Ill. 1946).  Thus, Shamrock is an "Insured" under the Title Policy as it is the "successor in ownership of the Indebtedness," and alternatively, because it is an "assignee" of Meridian's rights under the Title Policy, including claims thereon.

   **2.   Shamrock's right to recover $1,430,000.00**.

         **a.  First American's Motion for Summary Judgment**

First American moves for summary judgment, arguing the Title Policy is void *ab initio*, neither Meridian nor Shamrock "relied" on the Title Policy, and finally that the defect was "suffered, assumed, or agreed to" by the "Insured."

            **i.  Void *ab Initio***

First American argues the Title Policy is void *ab initio*, citing paragraph 4 of the Title Commitment which states, "[o]ur only obligation is to issue to you the Policy referred to in this Commitment, when you have met its Requirements" (Doc. 29-7, p. 3). And further Requirements, subsection (d), stating, "[y]ou must tell us in writing the name of anyone not referred to in this Commitment who will get an interest in the land or who will make a loan on the land" (*Id.*).  First American argues that pursuant to the Participation Agreement, Shamrock received a security interest in the Property in proportion to its investment and that for all intents and purposes the Great River Loan was a loan from Shamrock.  Thus, the Title Policy is void as written notice was not given to First American.

Shamrock responds first that because the Title Policy contains an integration clause, Requirements subsection (d) of the Title Commitment was not integrated into the Title Policy (*See* Doc. 29-14, Section 14(a), "This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company.").  In light of this integration clause, the parties intended the Title Policy to supersede the Title Commitment. *See Cont'l Mobile Tel. Co., Inc. v. Chicago SMSA Ltd. P'ship*, 587 N.E.2d 1169, 1174-73 (Ill. App. 1992) (integration clause supersedes all prior discussion and agreements); *see also Archambo v. Lawyers Title Ins. Corp.*, 646 N.W.2d 170, 176-77 (Mich. 2002) (subsequently issued title policy superseded antecedent title commitment due to integration clause of title policy and thus conditions of title commitment were nullified).    The Title Policy does not contain Requirements subsection (d) referenced above and thus First American's argument fails.

Moreover, assuming the Title Commitment controls the Title Policy dispute, the Title Commitment required Meridian to act in good faith in informing First American of parties who may take an interest in, or make a loan on, the Property.  Shamrock states First American has not offered evidence that Meridian did not act in good faith when it entered into the Participation Agreement after the Title Commitment was issued.  And further, First American's argument mischaracterizes the nature of the Participation Agreement.   Shamrock states a Participation Agreement is a loan between banks.  Shamrock purchased an interest in the Great River Loan; not the Property.  Further, it did not make a loan on the Property.   Duran, claims attorney for First American, confirmed this understanding of the Participation Agreement (*See* Doc. 29-18, Duran Depo., p. 28).

And finally, Shamrock notes that First American is essentially raising its affirmative defense that had Meridian disclosed the Participation Agreement, First American would have made additional requirements or exceptions to the Title Commitment and Title Policy (Doc. 11, p. 12).   In opposition, Shamrock offers the following portion of Duran's deposition:

> Q:     Okay.  So there would be no additional requirements or exceptions of the title commitment and policy resulting from the participation agreement, correct?
>
> A:     In reference to coverage under the policy, yes.
>
> Q:     Can you explain that?
>
> A:     Under the policy, only the person who's insured, which in this case is Meridian Bank, and or assigned is the insured under this policy. But Shamrock Bank is claiming an interest under the terms of the policy, and it's our position that Shamrock Bank is not an insured under the policy.
>
> Q:     Okay. So would your analysis change if Shamrock Bank was asserting its claim as assignee to Meridian Bank?
>
> A:     Yes.
>
> Q:     And in that instance, there would be no [additional] requirements as referenced in paragraph 11 [of the Third Affirmative Defense], correct?
>
> A:     That is correct.

(Doc. 29-18, Duran Depo., pp, 29-30).  On the basis of all of the above, the Title Policy is not void *ab initio* due to the Requirements subsection (d) of the Title Commitment.[7]

### ii.  Reliance

Next, First American argues that as an assignee, Shamrock is subject to the same defenses First American would have against Meridian.   As neither Meridian nor

---

[7] As Requirements subsection (d) of the Title Commitment does not render the Title Policy void *ab initio*, summary judgment is granted in Shamrock's favor as to First American's Third Affirmative Defense.

Shamrock relied on the Title Commitment or Title Policy when approving the Great River Loan and/or entering the Participation Agreement, First American argues it has no liability under the Title Policy to Shamrock.  *See First Nat'l. Bank of Northbrook, N.A. v. Stewart Title Guar. Co.,* 664 N.E.2d 310, 314 (Ill. App. 1996).

In support, First American argues Tomer told Rench, president and CEO of Meridian, about the "Possibility of Reverter," and also that Winfield and Peggy Stillwell[8] had "direct knowledge" of its existence.  According to First American, Rench's and Peggy Stillwell's knowledge can be imputed to Meridian, while Winfield's knowledge can be imputed to both Meridian and Shamrock as he was also a director, member of the loan committee, and shareholder of Shamrock.

As a preliminary matter, the Court notes that Meridian's reliance is the focus of this inquiry, as Shamrock's rights under the Title Policy arise from its status as a "successor in ownership of the Indebtedness" and/or assignee of Meridian.   As to Meridian's reliance on the Title Commitment, Meridian ordered the Title Commitment on November 29, 2007 (Doc. 37-2).   On November 30, 2007, First American issued the Title Commitment to Meridian.  On December 6, 2007, the Universal Note and Insured Mortgage were executed.

As president and CEO of Meridian, Rench testified that he was in charge of approving loans with the help of a loan committee (Doc. 29-8, p. 6).  Rench stated the underwriting process for loans involved reviewing title work (*Id.* at p. 10).  Rench did not specifically recall reviewing the Title Commitment First American prepared, but stated it was his practice to, "completely review any title commitment before the loan is

---

[8] According to Rench, Peggy Stillwell was on the board of directors of Meridian as of February 20, 2007 (Doc. 28-5, Rench Depo., p. 29).

ever funded" (*Id.* at p. 23).  Rench did not recall discussing the "reverter clause" with Tomer (*Id.* at 10).  Rench further testified that he was not aware of any "reverters" on the Property, that Meridian did not agree to assume the risk regarding any "reverter," and that Meridian would have relied on the Title Commitment from First American to inform its decision (*Id.* at p. 48).

First American relies on Tomer's deposition of January 20, 2011, as evidence that Rench, i.e., Meridian, did not rely on the Title Commitment or Title Policy.  Tomer testified as follows:

> At that time I said I thought about taking, it would be nice if we could do a loan on [the Property] but it probably wouldn't qualify because there's a reverter clause. [Rench] said he had glanced over the title policy but didn't notice one, but [would] check that out.
>
> I don't know the dates of any of these conversations because I was in the bank many times . . . The next time I recall he said, there's no, nothing on your title, there's no cloud on it.  I said, are you sure? I know we talked about it during the closing. He said, check your title policy. I went and checked my title policy, and sure enough, it was clear.
>
> .   .   .
>
> I was advised by [] Rench that there was nothing against the title, I believed I had full right to do whatever.

(Doc. 29-5, Tomer Jan. 20, 2011 Depo., pp. 9, 11).

First American argues Tomer's alleged statements to Rench concerning the "reverter clause" demonstrate Meridian did not rely on the Title Commitment and/or Title Policy in determining whether to enter into the Great River Loan.

Additionally, First American moves to strike Tomer's following statements as hearsay:

- "He said he had glanced over the title policy but didn't notice one, but I'll check that out" (*Id.* at p. 9).

- "The next time I recall he said, there's no, nothing on your title, there's no cloud on it" (*Id.* at p. 11).

Hearsay is defined as an out of court statement offered to prove the truth of the matter asserted.  Fed. R. Evid. 801.  Shamrock argues the above statements are either 1. not offered for the truth of the matter asserted, and/or 2. fall within the state of mind exception to hearsay.

As to the first statement, it concerns a future intent to perform an action. Shamrock offers these statements not to prove that Rench "glanced over the title policy," but as evidence of Rench's intent to investigate Tomer's alleged statements further.

As to the second statement, Shamrock does not offer it for the truth of the matter asserted, i.e., that there was no cloud on the title as that is clearly not true.  Shamrock offers the statement as evidence of Meridian's reliance on the Title Commitment and/or Title Policy.

Further, to the extent the above statements are hearsay, they are used to demonstrate Rench's intent to investigate Tomer's alleged statements concerning the "Possibility of Reverter" and thus fall under the state-of-mind exception, FEDERAL RULE OF EVIDENCE 803(3), to the hearsay rule. *See Catalan v. GMAC Mortg. Corp.,* 629 F.3d 676, 694-95 (7th Cir. 2011) (citing Fed. R. Evid. 803(3)).   Thus, First American's motion to strike these statements from the Court's consideration is denied.

Shamrock also asks that the Court disregard Tomer's January 20, 2011 statements in reliance on a June 17, 2009, deposition wherein Tomer testified that he

did not recall discussing the Simmons' "reversionary interest" with Meridian, i.e., Rench, at the "time of the mortgage" (Doc. 29-29, 2009 Tomer Depo., p. 118). First American moves to strike the 2009 Tomer deposition. First American relies on FEDERAL RULE OF CIVIL PROCEDURE 32(a)(8):

> *Deposition Taken in an Earlier Action.* A deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action. A deposition previously taken may also be used as allowed by the Federal Rules of Evidence.

Fed. R. Civ. P. 32(a)(8). First American states this deposition was taken in *Braswell v. Tomer, et al.,* (Madison County Illinois Case No. 08-L-582), a case involving a mechanics lien filed against Tomer to which First American was not a party.

Shamrock responds that it is using Tomer's prior 2009 deposition to demonstrate that the Court should disregard his 2011 testimony as inconsistent. Thus, it is properly before the Court pursuant to Fed. R. Civ. P. 32(a)(2) ("Any party may use a deposition to contradict or impeach the testimony given by the deponent as a witness, or for any other purpose allowed by the Federal Rules of Evidence."), and the rules of evidence. However, Shamrock notes that the admission of the 2009 deposition would not create a genuine issue of material fact, as the inconsistency demonstrates that Tomer's 2011 testimony is such that "no reasonable person would believe it." *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997).

Shamrock would like the Court to consider Tomer's 2011 statements concerning Rench's reaction to Tomer's alleged discussion of the "Possibility of Reverter," but also disregard the January 20, 2011 deposition as unreliable and inconsistent. The Court finds the 2011 statements are not of such a nature that "no reasonable person would

believe" them.   To the extent that Shamrock asks this Court to weigh Tomer's credibility, it grants First American's motion to strike Tomer's 2009 deposition and thus does not consider it.   Alternatively, the Court finds admission of Tomer's 2009 deposition would not create a genuine dispute of material fact.   Assuming the truth of the 2009 statement ("I do not recall") and 2011 statement (to summarize, "I now recall very well"), the substance of Tomer's 2011 statements do not raise a genuine dispute of material fact for the reasons below.

First American moves for summary judgment, arguing Meridian did not rely on the Title Commitment, in part, because Tomer made Rench aware of the existence of the "Possibility of Reverter."   Tomer's 2011 statements, made without reference to time frame, do not demonstrate Meridian did not rely on the Title Commitment.    And further, Tomer's recitation of Rench's reaction to Tomer's discussion of the "Possibility of Reverter" bolsters a finding that Meridian did in fact rely on the Title Commitment. Assuming the truth of Tomer's recollections, this conversation clearly took place *after* the Title Commitment and/or Title Policy had been issued.

As for Winfield, Tomer could not recall a specific conversation with Winfield concerning the "Possibility of Reverter" (Doc. 29-5, pp. 13-14).   He said it was possible, because he and Winfield were friends, but was not sure (*Id.*).   However, Tomer did state that he was "positive" Rench was the only Meridian "personnel" he dealt with in terms of the "substance of the [Great River Loan] transaction" (*Id.* at p. 10).   As for Peggy Stillwell, First American does not reference the record when it states Peggy Stilwell has "direct knowledge" of the "Possibility of Reverter."   The Court assumes it refers to the fact Peggy Stilwell ordered the Title Commitment (Doc. 28-3, Rekart Depo., pp. 22-23)

and in part notarized the Trustee's Deed (Doc. 29-4).  Rench could not recall ever having a conversation with Peggy Stillwell about the Great River Loan (Doc. 28-5, Rench Depo., p. 33).  And again, Tomer stated Rench was the only person he dealt with at Meridian concerning the substance of the Great River Loan.  The above facts do not raise a genuine issue of material fact concerning Meridian's reliance on the Title Commitment and/or Title Policy.

To the extent Shamrock's reliance on the Title Commitment is material to this dispute, First American generally cites Winfield's friendship with Tomer, Rench's statement that Shamrock asked Meridian to take the lead in the Great River Loan as Shamrock was based in Florida (Doc. 28-5, Rench Depo., p. 8), and similar factors, as evidence that Shamrock did not rely on the Title Commitment when it entered the Participation Agreement.

On December 4, 2007, Carney, in a memo to the "Directors Loan Committee" characterized the "Collateral" on the Great River Loan, in part, as "First mortgage on [the Property]."  His recommendation was as follows:

> Approval as submitted. Great River, combined with the guarantees of J. Lloyd and Christine Tomer, provides an acceptable risk for this loan. The Tomer's exhibit strong cash flow and credit scores.  The loan-to-value based on the real estate solely is 45%, and combined with the current value of YTB stock is 24%. Risks are recognized with the volatility of the YTB stock price, and the collateral.  However this is mitigated by the previously mentioned reasons, and the excellent relationship Lloyd Tomer has with Meridian [].

(Doc. 28-12).

In reliance on an email exchange between Carney and Rench (Doc. 28-13), First American argues that Shamrock had not seen the Title Commitment when it entered the Participation Agreement. On December 7, 2007, Carney emailed Rench with questions

about the Great River Loan. Most notably, "where is copy of title commitment?"  On December 10, 2007, Rench stated, "I will fax you a copy of the title commitment this morning" (*Id.*). According to Carney, Rench provided Carney a copy of the Title Commitment on the morning of December 10, 2007.  And further when the Shamrock's Directors' Loan Committee approved the Participation Agreement on December 10, 2007, he had seen the Title Commitment (Doc. 29-6, Carney Depo., p. 104; Doc. 28-14).

Similarly to Meridian, the Court finds First American has not presented sufficient evidence of Shamrock's lack of reliance on the Title Commitment in its decision to enter the Participation Agreement.  The Court has reviewed the record and finds that the evidence demonstrates that Shamrock based its decision to enter the Participation Agreement on a number of factors.  Shamrock relied, in part, on Tomer's relationship with Meridian.  However, the evidence also demonstrates that Shamrock looked to additional factors such as the Tomers', Great River's, and YTB's financial soundness (at that time), and its belief that the Insured Mortgage was a "first mortgage" on the property.  The fact that Shamrock looked to multiple factors does not logically lead to the conclusion that it did not also rely on the Title Commitment.

### iii.   "Suffered, Assumed, or Agreed to"

In reliance on the above, First American also argues Meridian "suffered, assumed, or agreed to," the "Possibility of Reverter," and thus Shamrock's claim is excluded (*See* Doc. 29-14, p. 2, "Exclusions From Coverage," ¶ 3).  "The burden is on the insurer to establish that a policy exclusion applies, and its applicability must be definite and free from doubt. Exclusion provisions that limit or exclude coverage must be construed liberally in favor of the insured and strictly against the insurer." *Czapski v. Maher*, 954

N.E.2d 237, 240 (Ill. App. 2011) (additional citations omitted).   "The 'created or suffered' exclusion is a standard one in title insurance contracts, and it is apparently '[o]ne of the most litigated' clauses in the field.'"   *Home Federal Sav. Bank v. Ticor Title Ins. Co.,* 695 F.3d 725, 732 (7th Cir. 2012) (quoting Palomar, *Title Insurance Law* § 6:10) (applying Indiana Law).   In summarizing the majority approach on the subject, the Seventh Circuit recently stated, "the 'created or suffered' language is intended to protect the insurer from liability for matters caused by the insured's own intentional misconduct, breach of duty, or otherwise inequitable dealings."   *Id.* at 732-33 (compiling cases).

And further,

> The cases discussing the applicability of the 'created or suffered' exclusion generally have stated that the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances in the course of purchasing the property involved. The courts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss.

*Id.* (quoting *Brown v. St. Paul Title Ins. Co.*, 634 F.2d 1103, 1107–08 n. 8 (8th Cir. 1980) (applying Missouri law) (additional citations omitted)).

First American seemingly relies on Rench's, Winfield's, and Peggy Stillwell's alleged "direct knowledge" of the "Possibility of Reverter," as evidence that coverage is excluded.   As stated above, First American has presented no evidence of either Winfield's or Peggy Stillwell's "direct knowledge" of the "Possibility of Reverter." And there is no evidence that anyone associated with Meridian had knowledge of the effect the "reversionary interest" would have on the title.

Assuming Tomer generally discussed the "reversionary interest" with Rench at some unknown time period this does not demonstrate awareness of the effect it would have on the title. "Assume," requires knowledge of the specific defect at issue, and "agreed to" denotes an explicit agreement. In this case, Tomer's s statement to Rench that he thought there was a "reverter clause" in the deed does not amount to evidence of either. First American has not provided evidence of intentional misconduct or affirmative action on the part of Rench, or anyone at Meridian associated with the Great River Loan, to "create, suffer, assume, or agree to," the title defect.

Meridian retained an expert, First American, to review the title of the Property, including the public records, to notify Meridian of any specific encumbrances on the Property.   First American admits its mistake in failing to expressly except the "Possibility of Reverter" noted in the properly recorded Trustee's Deed.  First American has not offered evidence capable of shifting the blame for its mistake to Meridian or its assignee, Shamrock.[9]

### b. **Amount of First American's Liability**

Whether Shamrock is an "Insured" because it is a "successor in ownership of the Indebtedness," or because it an assignee of the Title Policy, First American argues Shamrock is subject to the same defenses it would have had against FH Partners and Meridian.  As the Title Policy is a contract for indemnity against actual monetary loss of

---

[9] As the Court finds Meridian did not "suffer, assume, or agree to," the title defect at issue, Shamrock's motion for summary judgment as to First American's Second Affirmative defense is granted.  And finally, Shamrock seeks summary judgment as to First American's Fifth Affirmative defense (incorrectly identified by Shamrock as First American's Fourth Affirmative Defense), arguing Shamrock cannot file suit in Illinois as it is not registered to do business in Illinois. *See* 805 ILCS 5/13.70.  Shamrock has offered evidence that it does not "transact business" in Illinois and is thus not required to obtain a certificate of authority to maintain a civil action in Illinois (Doc. 29-6, Carney Depo., pp. 46-47).  First American has not offered evidence in rebuttal. Thus, summary judgment is granted in Shamrock's favor as to First American's Fifth Affirmative Defense.

damage, First American argues its liability is limited to Meridian's "actual loss of $50,000.00."

It is undisputed that Great River defaulted on the Great River Loan and that the Insured Mortgage is invalid.

Section 8 of the Title Policy provides,

**DETERMINATION AND EXTENT OF LIABILITY**
This policy is a contract of indemnity against actual monetary loss or damage sustained by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.
(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of
(i) The Amount of Insurance,
(ii) The indebtedness,
(iii) The difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or
.    .    .

(Doc. 29-14, p. 4).

First American argues that the Participation Agreement reduces the amount of Indebtedness.  The Court agrees with Shamrock that First American's interpretation of its extent of liability is not reflected in the Title Policy.  Shamrock relies on *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.,* 715 N.E.2d 778, 783-84 (Ill. App. 1999). In *C.A.M.,* the original plaintiff, the lending bank, assigned its rights, title, and interest in the subject note and mortgage, along with claims on the title policy, to C.A.M. C.A.M. was then substituted as plaintiff in the action against the title company. The trial court granted C.A.M.'s motions for summary judgment and the title company appealed.  On appeal, the title company argued C.A.M.'s recovery was limited to $4,500.00; the difference between the amount of the mortgage and the amount C.A.M. paid for the assignment.  The title company relied on the following provision of the policy at issue:

> Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the amount of insurance stated in Schedule A.

*Id.* at 783-84 (citing Section 9(b) of the policy).  The appellate court found, "C.A.M.'s payment was not a repayment of the principal of the indebtedness.  Rather, it was simply a transfer of the indebtedness from one entity to another for a premium." *Id.* at 784.  While not directly on point, the Court agrees that *C.A.M.* is at least instructive.

Meridian paid $1,300.00 for $1,300,000.00 in title insurance.  To reiterate, there was a complete failure of the Insured Mortgage.  $1,300,000.00 reflects the amount Great River owed Meridian under the Universal Note and thus to Shamrock as Meridian's assignee. First American fails to convince the Court that the Participation Agreement, a separate and distinct agreement from the Universal Note, impacts the amount owed Meridian under the Universal Note.  The Amount of Insurance owed under the Title Policy does not decrease because a lender sells or assigns the Indebtedness to a third party.  And further, the fact Shamrock's participation was "without recourse" against Meridian does not alter the amount Great River owed to Meridian, i.e., the amount Meridian could not recover due to the Insured Mortgage's complete failure.

As to the exact amount of First American's liability, Shamrock states that "actual monetary loss or damage" arising from a complete failure of title is the difference between the mortgagee's security interest and the value of the mortgage subject to the defect. *See Gray v. Commonwealth Land Title Ins. Co.*, 27 A.3d 852, 856 (N.H. 2011)

(Duggan, J.); *see also Allison v. Ticor Title Ins. Co.*, 907 F.2d 645, 651-52 (7th Cir. 1990) ("It is hard to see how 'actual loss' could exceed market value on the date of the loss.") (applying Wisconsin law).

Shamrock offers an appraisal of the Property conducted by Colliers Appraisers, Ltd. on October 29, 2010, valuing the property at $3,225,000.00 (Doc. 29-2). This of course exceeds the Amount of Insurance and the indebtedness.  As for the other collateral securing the Great River Loan, Shamrock states that as of July 29, 2013, the YTB stock price was $.01 and had a 52 week high of $.02.  Thus, First American's liability, pursuant to Conditions, Section 8(a), for the complete failure of the Insured Mortgage, is $1,300,000.00.[10]

Further, under Conditions, Section 8(b)(i), Shamrock is entitled to an additional increase of 10% to the "Amount of Insurance," as First American unsuccessfully defended Shamrock in the Madison County Litigation.

Finally, Shamrock's motion for summary judgment seeks entry of judgment against First American in the amount of "$1,430,000, plus pre-judgment interest" (Doc. 26).  It does not appear Shamrock addresses its pre-judgment interest request in its briefing to the Court.  Illinois courts have recently noted that the award of statutory interest is within the sound discretion of the trial court.  *See Fed. Ins. Co. v. Binney & Smith, Inc.*, 913 N.E.2d 43, 60 (Ill. App. 2009); *United Nat. Ins. Co. v. 200 North Dearborn P'ship.*, 979 N.E.2d 920, 929 (Ill. App. 2012).  As Shamrock does not address its request for pre-judgment interest, the Court denies its request.

---

[10] To this extent, Shamrock's motion for summary judgment as to First American's First Affirmative Defense is granted.

Thus, Shamrock's motion for summary judgment on Count I of its First Amended Complaint and on First American's Counterclaim for Declaratory Judgment is granted in part (Doc. 26) and First American's motion for summary judgment is denied (Doc. 27). Judgment shall be entered in favor of Shamrock and against First American in the amount of $1,430,000.00.

## V.   <u>CONCLUSION</u>

For the reasons stated above, the Court finds as follows:

Shamrock's motion for summary judgment on Count I of its First Amended Complaint and on First American's Counterclaim for Declaratory Judgment is **GRANTED in part**, as the Court shall enter judgment in favor of Shamrock and against First American in the amount $1,430,000.00 (Doc. 26). Shamrock's motion for summary judgment on First American's affirmative defenses (Doc. 30), and its motion to supplement the summary judgment record (Doc. 43), are **GRANTED**. Shamrock's motion to strike portions of First American's undisputed facts (Doc. 39) is **DENIED**. First American's motion for summary judgment is **DENIED** (Doc. 27). First American's motion to strike portions of Shamrock's facts is **GRANTED in part** (Doc. 41).

The Clerk is instructed to enter judgment in favor of Shamrock and against First American on Shamrock's Count I in the amount of $1,430,000.00. Judgment shall also enter in favor of Shamrock and against First American as to First American's counterclaim for declaratory judgment.

**IT IS SO ORDERED.**
Signed this 28th day of March, 2014.

Digitally signed by David R. Herndon
Date: 2014.03.28 12:47:30 -05'00'

**Chief Judge**
**United States District Court**